NATIONAL SURETY CO. v. STATE SAVINGS BANK.

(Circuit Court of Appeals, Eighth Circuit. June 18, 1907.)

No. 2,478.

1. COUNTIES—DEPUTY AUDITOR—LIABILITY ON OFFICIAL BONDS—MISCONDUCT IN OFFICE.

A deputy county auditor in Minnesota, authorized by law to act in the name of his principal and for whose official acts the auditor and his bondsmen were responsible, not only to the county, but to any person injured by his "misconduct in office" (Gen. St. Minn. 1894, §§ 710, 5951), issued

spurious refund orders on the county treasurer in favor of fictitious payees, purporting to be for the refunding of taxes received through redemption from tax sales. He procured the orders to be authenticated by the chairman of the board of county commissioners, forged the names of the fictitious payees to assignments thereof, and sold the same to a bank. *Held*, that any loss sustained by the bank through its purchase of the orders could not be attributed to the official misconduct of the deputy in issuing the same, but that its proximate cause was his individual acts in forging the assignments and selling the orders as genuine; that, the orders being nonnegotiable, the bank was put on inquiry, and acquired no greater rights than the supposed payees, and had no claim to recover any such loss, either from the county or the surety on the auditor's bond.

2. SUBROGATION—PAYMENT OF DEBT BY SURETY.

A year after the issuance of such orders they were presented to the county treasurer and paid, with interest. Upon the discovery of their fraudulent character the county brought suit against the auditor on his bond, and by the final judgment of the Supreme Court of the state recovered a judgment, which was paid by the surety. *Held*, that the bank was primarily liable to the county for the amount received from its treasurer as money had and received to the county's use, and that the surety of the auditor, having paid the debt to the county, was entitled by equitable subrogation to enforce its right of recovery against the bank.

3. SAME—SCOPE OF DOCTRINE—RIGHTS OF SURETY.

Subrogation is not a matter of strict right, but is purely equitable in its nature, dependent upon the facts and circumstances in each particular case, and intended to serve the purpose of compelling the ultimate discharge of a debt or obligation by him who in good conscience ought to pay it. The doctrine is sufficiently broad to entitle a surety who has paid the debt of his principal to the remedies which the creditor had, not only against the principal, but against others.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Subrogation, §§ 17, 18.]

Hook, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Minnesota.

W. B. Bourne having been duly appointed deputy auditor of Ramsey county, Minn., by W. R. Johnson, the auditor, and being as such authorized to sign all papers and do all other things that the auditor himself might do, purporting to act by authority of the statute of that state providing for refunding to the holders of invalid certificates of sale for nonpayment of taxes the amounts paid by them therefor, drew seven spurious refunding orders, some purporting to be in favor of William Mannering, a fictitious person, and some purporting to be in favor of E. J. Trowbridge, another fictitious person, upon the treasurer of the county, requiring him to refund to those fictitious persons the different sums specified in each order, which aggregated in all $7,-352.49. Bourne in some way procured the chairman of the board of county commissioners to authenticate the orders as genuine. They did not purport to be negotiable or transferable. One of them, which may be referred to as a sample of all, is in the following words:

"Treasurer of Ramsey County. Minnesota:

"Refund to William Mannering, the sum of fifteen hundred and 54/100 dollars as follows: [Here appears a description of the lands against which the taxes purported to have been assessed and a statement of several particulars, including the amount assessed against each tract, the penalties, costs, etc.] —being tax refunded.    Sec. 1697, Laws of 1894.

"[Signed]      ·W. R. Johnson, Auditor of Ramsey County, Minn.
                                          "Per W. B. Bourne, Deputy.

"By order of Board of Co. Com.
    "[Signed]                              A. R. Kiefer, Chairman."

The deputy sold the fictitious orders, with an assignment on the back of each of them, signed by him in the names of the myths to whom they were payable, to the State Savings Bank, for their full face value, which was, in a way unnecessary now to state, paid to him. They bore interest at the rate of 7 per cent. per annum. The bank held them for about a year, then presented them to the county treasurer for payment, and received from him their full face value, with accrued interest, amounting to $7,366. Thereafter, on discovering the fraud perpetrated upon it, the county instituted its suit against the National Surety Company, surety on the auditor's official bond, and recovered judgment for the amount paid the State Savings Bank. After paying the judgment the surety company filed its bill in the court below to be subrogated to the rights of Ramsey county against the State Savings Bank and to recover the amount it had been required to pay as surety for the auditor. From an order sustaining a demurrer to the bill, and dismissing the same, the surety company prosecutes its appeal to this court.

Edmund S. Durment (Albert R. Moore and W. J. Griffin, on the brief), for appellant.

John D. O'Brien, for appellee.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge (after stating the facts as above). The bank purchased nonnegotiable orders or drafts upon the county treasurer, payable to fictitious persons, and by them apparently assigned to it. The orders being nonnegotiable, the bank acquired no greater right to them than its assignors had. The assignors being fictitious persons, and the orders themselves without consideration, fraudulent, and void, the assignee acquired no right against the county. When it presented the orders to the treasurer for payment, and secured payment thereof, it received moneys of the county without consideration, and unquestionably thereby became liable to the county for money had and received to its use. The surety company, as surety for the auditor, whose official misconduct, through the act of his deputy, subjected it to liability (Board of Co. Com'rs v. Sullivan, 89 Minn. 68, 93 N. W. 1056), having restored to the county the amount of its loss, now claims to be subrogated to the county's right of action against the bank to recover from the latter the amount paid by it to the county. Can this be done? The bank places some reliance, in denying the claim of the surety company, upon section 5951, Gen. St. Minn. 1894, which reads as follows:

"The official bond or other security of a public officer to the state or any municipal body or corporation, whether with or without sureties, is to be construed as security to all persons severally for the official delinquencies against which it is intended to provide as well as to the state, body or corporation designated therein."

This section is in pari materia with section 710 of the same Statutes. The latter reads as follows:

"An action may be brought against the county auditor and his sureties in the name of the state of Minnesota and for its use or for the use of any county or person injured by the misconduct in office of the auditor or by the omission of any duty required of him by law."

These sections of the statute must be read into and treated as a part of every official bond contemplated by them. Accordingly, if the bank had been injured by reason of its purchase of the orders from Bourne, and that injury had been occasioned by Bourne's official delinquency or

misconduct in office, it might have recovered its loss from the surety company. If, by virtue of these statutes, the bank could have recovered from the surety company, as a matter of course the surety company cannot now recover from the bank.

We are therefore to inquire whether, if the bank had failed to secure payment of its refunding orders from the county treasurer, its loss or injury would have been so produced by the misconduct in .office of Deputy Auditor Bourne as to subject the surety of the auditor to liability for it. It is true the bank could not have lost any money, or could not have been injured, if Bourne had not in his official capacity signed the spurious refunding orders. That act, being performed in the line of his official duty, was a misconduct in office, within the meaning of the statutes referred to; but the question still remains whether it or some other cause produced the bank's assumed injury.

The misconduct of Bourne in much of what he actually did and in what was necessarily involved, namely, in falsely representing to the bank that the orders were genuine, that the payees had paid money to the county treasurer for taxes, and were entitled under the law to an order refunding the amount so paid, that they were actual persons, instead of myths, and his further misconduct in fraudulently signing the mythical names to the assignments, in negotiating with the bank, and wrongfully securing its money, were altogether personal in their character. They were in no sense representative or official. No duty arising out of his official relation required him to make any of the representations or commit any of the crimes just alluded to. On the contrary, the nonnegotiability of the orders, and possibly the intervention and activity of Bourne, as shown by the bill, should have attracted the attention of the bank, and warned it against purchasing the orders without making diligent inquiry concerning their validity. Bourne's personal representations and acts were well adapted to be the effective cause of the bank's injury, and, giving to the original official misconduct its natural force and effect only, were, in our opinion, the direct moving cause of the injury, without which it could not have occurred. They did not in a mere incidental and subordinate way work out the natural and probable consequences of the original official misconduct, but were, as between the deputy and the bank, the proximate and all-sufficient cause of the latter's injury. An act is the proximate cause of those results only which are its natural and probable consequences, and which ought to have been foreseen in the light of the attending circumstances. Milwaukee, etc., Railway Co. v. Kellogg, 94 U. S. 469, 474, 24 L. Ed. 256; Travelers' Ins. Co. v. Melick, 12 .C. C. A. 544, 65 Fed. 178, 184, 185, 27 L. R. A. 629; Citizens' Gas & Electric Co. v. Nicholson (C. C. A.) 152 Fed. 389, and cases cited. Within the fair and reasonable meaning of the bond and statutes in question, Bourne's personal, as distinguished from official, acts caused the assumed injury which the bank sustained.

But it is urged that the Supreme Court of Minnesota in Board of Com'rs v. Sullivan, supra, sustained a recovery by the county against the surety company for its loss made in paying the forged orders on the ground that Bourne's wrongful acts constituted "misconduct in of-

fice," within the meaning of the Statutes of Minnesota, and that the same rule of law would have been applicable if the bank had sued the surety company for its assumed loss. We cannot agree to this. The orders in question were apparently lawfully drawn, lawfully counter-signed, and genuine. The natural and probable consequence of their issue was their presentation to the treasurer, to whom they were addressed, and payment of them by him. The statutes of the state made it his duty to pay authorized orders of that kind. The surety company was liable to the county, because the presentation to the treasurer and the payment of the orders by him were the natural and probable consequence of their issue, and might have been reasonably anticipated by any prudent person. Right here is the radical and decisive difference between the position of the county and that of the bank. While the payment by the county was, in the ordinary course of business, reasonable and probable, the purchase of the orders by the bank on the assignments made in the name of myths by Bourne was not the natural or probable consequence of their issue. No one could have reasonably anticipated that a bank or any rational person would disregard the law which makes a nonnegotiable chose in action in the hands of an assignee subject to every defense existing in favor of the maker against the assignor, purchase a nonnegotiable order of the kind in question, and pay the purchase price thereof to one who was not the payee named therein, without inquiring into the genuineness of the assignment and the genuineness of its execution. Such a purchase would be out of the ordinary course of business, unnatural, improbable, incapable of anticipation, and in no legal sense the natural and probable consequence of the issue of the orders. For these reasons the purchase by the bank cannot be held to have so resulted from the "misconduct in office" of Bourne as to subject the surety company to liability to the bank for any loss it might have sustained by reason of its purchase.

Again, it is elementary that no liability could exist in favor of the bank against the surety on the bond of the auditor, unless it existed against the principal in the bond, the auditor himself, or the county of Ramsey, for which he was acting. If any argument is necessary to demonstrate that the bank never could have recovered its loss from the auditor himself, the following observations will be sufficient: The bank purchased nonnegotiable refunding orders, made nonnegotiable obviously for the purpose of preventing fraudulent practices and fraudulent dealings with them, and took them by assignment of the rights of the supposed payees. All it got by such assignment was the right which the supposed payees themselves had; and that, according to the undisputed facts in this case, was nothing. The bank took them subject to all the equities existing between the supposed payees and the auditor, or the county, whom the auditor represented; and those equities, according to the undisputed facts of the case, were unquestionably sufficient to defeat any claim of the bank against either of them. Taking an assignment of nonnegotiable securities, it was bound to inquire, not only whether all steps had been taken to create a legal liability against the county, but also as to the genuineness of the assignment of the right of the original payees. If such inquiry had been made

at the places and of the officers plainly suggested on the face of the securities themselves, the bank would have unquestionably learned the fact that they were bogus and fraudulent, and saved itself from any possible loss. In such circumstances failure to make inquiry was culpable negligence. In no view, therefore, could the bank, by virtue of the statutes referred to, have maintained an action against the surety company, which incurred no greater liability than the principal in the bond, to recover its loss, if the county treasurer had not honored and paid the orders.

Having now disposed of the proposition that defendant is not protected by the Minnesota Statutes relied on, we are brought to the meritorious equitable question in the case, whether the surety company, which, as surety for the auditor, paid the county the amount of its loss, is entitled to be subrogated to the rights of the county against the bank, which improperly received its money and occasioned its loss. Subrogation is not a matter of strict right, but is purely equitable in its nature, dependent upon the facts and circumstances of each particular case, and intended to serve the purpose of compelling the ultimate discharge of a debt or obligation by him who, in good conscience, ought to pay it. American Bonding Co. v. National Mechanics' Bank, 97 Md. 598, 55 Atl. 395 (see note to same case in 99 Am. St. R. 474); Crippen v. Chappel, 35 Kan. 495, 499, 11 Pac. 453, 57 Am. Rep. 187; Barnes v. Mott, 64 N. Y. 397, 401, 21 Am. Rep. 625; Arnold v. Green, 116 N. Y. 566, 571, 23 N. E. 1; McCormick's Adm'r v. Irwin, 35 Pa. 111. The bank had a fund in its possession, so obtained from the county that it became liable to the latter as for money had and received to its use. Most naturally the county, when it found its money was gone, should have proceeded against the person or persons who had it, and thus simply have retaken its own; but, instead of doing so, it resorted to and recovered from the surety company on its contract of indemnity. Had the county, upon receipt of its money from the surety company, assigned its claim against the bank which had the lost money (a thing which equity and good conscience certainly would have approved, if not required), no one could doubt the right of the surety company to recover on the claim so assigned; and, inasmuch as in equity and fair dealing such an assignment should have been made, we cannot doubt the justice and equity of treating that done which ought to have been done. Subrogation is nothing more than an equitable assignment. When equity and good conscience requires the assignment to be made, subrogation, if necessary, will be allowed.

The general proposition that a surety, upon paying to a creditor the debt of his principal, is entitled to be subrogated to all the rights of the creditor against the principal, and to the benefit of all securities for the debt held by the principal, is universally acknowledged. According to this doctrine the surety company in the present case could have proceeded against the auditor to enforce any rights or securities held by the county against him. But the question now is whether its rights can be extended beyond the general rule, and it be subrogated to a claim and cause of action which the county had against the bank for appropriating the money which made the surety company liable to

the county. However limited the right of subrogation originally was, the remedy now has been so broadened that it has been called —

"the mode which equity adopts to compel the ultimate payment of a debt by one who in equity, justice, and good conscience should pay it." Arnold v. Green. 116 N. Y. 566, 571, 23 N. E. 1, and cases cited.

In Baylies on Sureties and Guarantors, p. 358, it is said:

"The right of subrogation to the remedies of the creditor on payment of the debt of the principal is not restricted to the remedies which the creditor had as against the principal, but extends to all the remedies which he had against the principal and others liable for the debt."

In the case of Lidderdale v. Robinson, 12 Wheat. 594, 6 L. Ed. 740, the Supreme Court, after referring to the principle that a court of equity lends its aid to compel a creditor to assign a cause of action which it has against a third person to sureties who have paid the debt of their principal, says:

"This fully affirms the right to succeed to the legal standing of their principal; and, after establishing that principle, it is going but one step farther to consider that as done which the surety has a right to have done in his favor, and thus to sustain the substitution, without an actual assignment."

In Rooker v. Benson, 83 Ind. 250, 255, the doctrine as announced by Baylies (supra) is held to be the law.

In Fox v. Alexander, 1 Ired. Eq. (N. C.) 340, it is held that a surety of a guardian, who pays a debt of the guardian to the ward, stands in the shoes of the ward, and may follow the trust fund wherever it goes.

In Blake v. Traders' Bank, 145 Mass. 13, 12 N. E. 414, the facts are that a trustee pledged to a bank certain shares of stock belonging to a trust estate as security for the payment of his individual debt to the bank. The bank, or its successor, afterwards sold the shares and applied the proceeds on the debt of the trustee. The bank knew, or could have known from an inspection of the papers, that the shares were held by its debtor as trustee. A surety on the trustee's bond was compelled to pay to the trust estate the value of the stock converted by the bank. It was held that the surety was subrogated to the rights of the trust estate and could maintain a bill in equity against the bank to recover the amount paid by him. The court in its opinion, among other things, said:

"In this case the defendant and the surety were both liable to the trustees for the amount of the trust property—the former, in consequence of participating in the wrongful act of the first trustee; and the latter, by his contract to indemnify the estate against such act. The cases are analogous where one owner of property has claims for a loss against an insurer and a tortfeasor. The insurer is in the nature of a surety, and, upon paying the loss, he is subrogated to the rights of the owner to recover for the tort"—citing Hart v. Western Railroad, 13 Metc. (Mass.) 99. 46 Am. Dec. 719; Clark v. Wilson, 103 Mass. 219, 4 Am. Rep. 532; Mercantile Ins. Co. v. Clark, 118 Mass. 288.

See to the same effect, Sheldon on Subrogation, § 89.

It is said in American Bonding Co. v. National Mechanics' Bank, 97 Md. 599, 606, 55 Atl. 395, 397, 99 Am. St. Rep. 466:

"That the doctrine of subrogation does go to the extent of giving to the surety, who has paid the debt of the principal, the benefit of the rights and

remedies of the creditor against all persons who were liable for the debt is both asserted by text-writers and sustained by the authority of many decided cases. * * * This is especially held to be true of the sureties of a fiduciary who are compelled to answer for his breach of trust, and they have repeatedly been subrogated to the rights and remedies of both the trustee and the cestui que trust against the fiduciary and those participating in the wrongful act."

It is held in an elaborate and well-considered opinion (Railway Company v. Fire Association, 55 Ark. 163, 175, 18 S. W. 43) that an insurance company, after paying the amount of a fire loss, may be subrogated to the assured's right of action against the person or corporation who caused the fire. The court said:

"Both were responsible to the assured. The loss for which they were responsible was one and. the same, and the assured was entitled to but one satisfaction. It had a right to demand and receive payment of the loss from the insurer by virtue of its contract, as it did, without seeking to recover it of the wrongdoer. As it did so, and received payment of the insurer, the wrongdoer was not thereby discharged from liability; but the insurer succeeded to and became entitled to the assured's rights to relief against him to the extent of the amount paid as an indemnity, he being primarily liable, and the assured holds the claim against him in trust for the insurer."

The same conflagration which was the subject of the last-mentioned case was considered by the United States Supreme Court in St. Louis, etc., Railway Co. v. Commercial Ins. Co., 139 U. S. 223, 11 Sup. Ct. 554, 35 L. Ed. 154, and Mr. Justice Gray, speaking for that court, said:

"In fire insurance, as in marine insurance, the insurer, upon paying to the assured the amount of a loss of the property insured, is doubtless subrogated in a corresponding amount to the assured's right of action against any other person responsible for the loss."

In Boone Co. Bank v. Byrum, 68 Ark. 71, 56 S. W. 532, the facts are that a collector of state taxes deposited money in a bank, which, with knowledge that the deposit consisted of taxes collected by him, appropriated a part of it to satisfy the collector's individual debt. The surety on his official bond, after paying to the state the amount of the misappropriation, was subrogated to the right of the state to the deposit against the bank.

Reason and authority, as disclosed by the foregoing citations, conduce to only one result; and that is that a surety, after paying the debt of his principal, is entitled to be subrogated to remedies which the principal had against third parties for the claim which the surety paid.

But it is argued, that, because the bank did not have actual knowledge and did not participate in the wrong perpetrated upon the county by Bourne, it is not brought within the principle of the foregoing cases, and should not be held liable to the surety. This view seems to have been adopted by the learned trial judge; but, after a full and patient consideration of the subject, we are unable to give it our sanction. The bank may not have been morally culpable; but its failure to discharge the duty of making inquiries suggested by the nonnegotiable character of the orders which it purchased, and by other circumstances attending the transaction, was an act of omission equally as effective to occasion injury to the county as many affirmative acts of commission could have been. Such inquiry at the audit-

or's or treasurer's office would have quickly disclosed that the payees were entitled to nothing, that they were myths, and that misrepresentation, fraud, and forgery were being practiced upon the county. Ignorance in fact occasioned by indulging indifference to almost obvious danger and negligence of the grossest sort is entitled to little consideration by a court of conscience. The bank's negligence operated as effectually to defraud the county as any willful or intentional participation in the fraudulent scheme could have done. If the bank did not have actual knowledge of the fraud, it did have, under well-recognized law, constructive knowledge of all the facts which reasonable inquiry would have disclosed, and therefore of the fraud itself. Such knowledge in ordinary civil actions subjects its possessor to all the consequences of knowledge in fact, and we see no reason why it should not do so in the present case. Notwithstanding the contrary contention, we think a brief reference to the authorities will support our conclusion.

In Hall & Long v. Railroad Companies, 13 Wall. 367, 370, 372, 20 L. Ed. 594, it is held that an insurer of goods destroyed by fire in course of transportation by a common carrier is entitled, after he has paid the loss, to recover what he has paid by suit against the carrier. In delivering the opinion of the court, Mr. Justice Strong makes use of the following language:

"Standing thus, as the insurer does, practically, in the position of a surety, stipulating that the goods shall not be lost or injured in consequence of the peril insured against, whenever he has indemnified the owner for the loss, he is entitled to all the means of indemnity which the satisfied owner held against the party primarily liable. His right rests upon familiar principles of equity. It is the doctrine of subrogation, dependent not at all upon privity of contract, but worked out through the right of the creditor or owner. * * * It has been argued, however, that these decisions rest upon the doctrine that a wrongdoer is to be punished; that the defendants against whom such actions have been maintained were wrongdoers; but that, in the present case, the fire by which the insured goods were destroyed was accidental, without fault of the defendants, and therefore that they stood, in relation to the owner, at most in the position of double insurers. The argument will not bear examination. * * * The law raises against him [the carrier] a conclusive presumption of misconduct, or breach of duty, in relation to every loss not caused by excepted perils."

In The Potomac, 105 U. S. 630, 634, 26 L. Ed. 1194, considering a similar subject, the Supreme Court makes the following observation:

"The mere payment of a loss by the insurer does not, indeed, afford any defense, in whole or in part, to a person whose fault has been the cause of the loss, in a suit brought against the latter by the assured. But upon familiar principles, often recognized by this court, the insurer acquires by such payment a corresponding right in any damages to be recovered by the assured against the wrongdoer, or other party responsible for the loss. * * * *"

To the same effect are Phoenix Ins. Co. v. Erie & Western Transportation Co., 117 U. S. 312, 320, 6 Sup. Ct. 750, 29 L. Ed. 873; Wager v. Providence Ins. Co., 150 U. S. 99, 108, 14 Sup. Ct. 55, 37 L. Ed. 1013; Norwich Union Fire Ins. Soc. v. Standard Oil Co., 8 C. C. A. 433, 59 Fed. 984; Chicago, etc., Railroad Co. v. Pullman Car Co., 139 U. S. 79, 11 Sup. Ct. 490, 35 L. Ed. 97; Atlantic Ins. Co. v.

Storrow, 5 Paige (N. Y.) 285. In the last-mentioned case it is held that where the master or shipowners are liable for a loss by theft for which underwriters are also liable, if the underwriters pay the loss to the assured, they are entitled in equity to be subrogated to his rights against the master or shipowners; and this, notwithstanding the fact that the thieves were in no way connected with the ship.

In Browne v. Fidelity & Deposit Co. of Maryland, 98 Tex. 55, 80 S. W. 593, the facts are that a guardian sold real estate belonging partly to himself and partly to his wards, and took notes payable to his own order for deferred payments, then sold and assigned the notes to a third party (Lee), and converted the proceeds to his own use. He was afterwards removed, and a new guardian appointed, who collected the amount of the defalcation from the Fidelity & Deposit Company, a surety on the defaulting guardian's bond. Thereupon the surety brought his action against Lee, the purchaser of the notes, claiming that the assignment of the notes to Lee were forbidden by statute, and therefore that he did not get good title by his purchase. The court held that, the assignment to Lee being unauthorized, the title to the notes did not pass, and he was liable to the new guardian for the value thereof, notwithstanding the fact he had paid the same to Lee. In that case there was no showing that Lee, the purchaser of the notes, was a party to the guardian's wrong, or that he had actual knowledge that the notes purchased were the property of the ward. He was affected with constructive knowledge only.

In Skiff v. Cross, 21 Iowa, 459, the facts are that the sheriff levied an execution in favor of Cross against John Mosier on a county warrant as the property of the defendant in execution and delivered the same, as permitted by Iowa statutes, to Cross, who received it in full satisfaction of the execution. Daniel Mosier claimed the warrant as his property, and sued the sheriff and sureties on his official bond for conversion of it, and recovered judgment, which the sureties paid. It was held that the sureties were entitled to be subrogated to the rights of Daniel Mosier against Cross, who got his property. Dillon, Judge, afterwards United States Circuit Judge for this circuit, delivered the opinion of the court. He said as follows:

"Now, if Cross would be liable in respect to the order if he had been proceeded against directly by Daniel Mosier, what good reason can be given why he should not be liable to the plaintiffs? We can discover none. Daniel had his election to go against Cross or against the sheriff and his sureties. He chose to proceed against the sheriff and his sureties, and the sureties were compelled to pay him. Is it any greater hardship on Cross to pay the amount of the order to the sureties than it would have been to have paid it directly to Daniel? Is it not equitable to treat the sureties who have paid to Daniel, as substituted by operation of law to Daniel's right as against Cross? The ground of Cross' liability is that he has received money to which he has no right or claim, and for which plaintiffs have been compelled to account."

The case does not disclose that defendant Cross had any actual knowledge of the ownership of the warrant in question when he took it in satisfaction of his execution. Whether he knew it or not seems from the opinion to have been quite immaterial, as the court appears to be totally indifferent to that fact.

In Edmunds v. Venable, 1 Patt. & H. (Va.) 121, a trustee or committee, holding two bonds showing on their face that they belonged to the estate of a lunatic, sold them to a third person, who thought he was engaged in an innocent and lawful transaction. The purchaser afterwards realized on them, and was held bound to account to the estate for what he received, notwithstanding the fact he had paid for them their full value; and it was further held that sureties of the trustee, who had been decreed to answer for his defaults, were entitled to be subrogated to the rights of the lunatic against the purchaser. The Court of Appeals held, in the language of one of the judges, that the right of subrogation existed, although the purchaser of the bonds—

"did not intend to commit a fraud, and did not suspect that he was engaged in a transaction not perfectly innocent, but unwarily had done that which may subject him to loss, but to no imputation upon his motives."

It appears from the foregoing that what seems to us to be the natural equities between the parties is supported by abundant authority. The case was disposed of below on demurrer to the bill, which set out the facts as already discussed. The trial court sustained the demurrer, and entered a final decree dismissing the bill. This, from what has been said, was error.

The decree is reversed, and the cause remanded to the Circuit Court, with directions to permit an answer to be filed and otherwise proceed in harmony with this opinion.

HOOK, Circuit Judge (dissenting). The case in brief is this: A deputy county auditor of Ramsey county, Minn., for whose official conduct and integrity the surety company stood sponsor, fabricated some orders on the county treasurer payable to fictitious persons. He forged the names of the payees to indorsements of the orders and disposed of them to the bank for face value. In form the orders were nonnegotiable, but it is conceded that in fact the bank acted innocently in buying them. Afterwards the county treasurer, being in funds, paid to the bank the amount of the orders and accrued interest. When the criminal conduct of the deputy auditor was discovered, the county, acting through its board of county commissioners, cast about to recover its loss. It sued the auditor and the surety company, his official bondsman, and obtained judgment which met with the approval of the Supreme Court of Minnesota. Board of Co. Com'rs v. Johnson, 89 Minn. 68, 93 N. W. 1056. The surety company paid the judgment and now seeks reimbursement from the bank. It invokes the equitable doctrine of subrogation, and claims that the county could have maintained an action against the bank for the recovery of the money paid on the spurious orders, and therefore it should be put in the place of the county. It is admitted at the threshold of this proposition that if the bank had sustained the loss, instead of the county, and could in such case have recovered from the surety company, of course, the latter cannot now recover from the bank.

Could the bank have recovered from the surety company? I said at the beginning that the surety company stood sponsor for the of-

ficial conduct and integrity of the deputy. The Minnesota court so decided, and its decision to that effect lies at the root of the judgment which the county obtained and the surety company paid. A statute of Minnesota made the bond of the surety company available, not only to the county, but also to every person damaged by the official misconduct of the auditor; and in this connection we may substitute the deputy for the auditor, because the auditor and the surety company were responsible for whatever the deputy did by virtue of his office. The sole test of the liability of the surety company to the county was loss resulting from official misconduct of the deputy. Precisely the same test applies between the surety company and the bank and every other person seeking indemnity for loss caused by the deputy. Now the Supreme Court of Minnesota held in effect that the loss sustained by the county by the payment of the money to the bank in redemption of the orders was due to the official misconduct of the deputy. The recovery by the county upon the bond of the surety company could have proceeded upon no other theory. The swindling scheme of the deputy commenced with his forgery of the spurious orders, and it must be conceded that this was done under color of his office; in other words, that it was official misconduct. He was convicted and sent to prison for it. State v. Bourne, 86 Minn. 426, 90 N. W. 1105. The final act in the transaction was the payment by the county treasurer to the bank; and the Supreme Court of Minnesota in effect held in the action brought by the county that the loss of funds so caused was likewise due to the official misconduct of the deputy, and for that reason a recovery by the county upon the bond was sustained. The conclusion of my associates, therefore, exhibits this situation: The surety company, being answerable to every person injured by the official misconduct of the deputy auditor, is liable for loss caused by the forging of the orders, and also for loss caused by the payment of them by the county to the bank; but it is not liable for any intervening loss, because all intervening acts of the deputy were his personal acts, not done under color of his office. It seems to me that this is a short-circuiting that is not at all in harmony with the decision of the highest court of the state upon a matter peculiarly within its province to decide. If the county could recover from the surety company for the loss of the money it paid to the bank, and it was held that it could, I am unable to see why the bank, equally protected by the bond, would not, if the orders had remained on its hands, be entitled to recover the money it paid to the deputy auditor. That the bank might recover from the surety company seems clear, unless it is held that the decision of the Supreme Court of Minnesota is wrong, and that no recovery by the county from the surety company should have been allowed because, after the deputy, acting under color of his office, had forged the orders, he did some personal acts in furthering his scheme of obtaining moneys from the treasury, such as indorsing and selling them, which were not covered by the bond. That is what we are brought to. Can the conduct of the deputy properly be characterized as official delinquency towards the county, and at the same time be called mere personal, unofficial conduct as to third persons, who are equally protected by the

bond? What is there that makes the same conduct official in one view and personal in the other? Ordinarily the test is the scope of the officer's powers and duties and the nature of the transaction in question.

It is also said that loss by the bank could not have been caused by the official misconduct of the deputy, because such loss does not naturally follow the forgery of nonnegotiable orders. With the greatest respect for the views of my associates, I think this conclusion results from a misapplication of an admixture of rules of commercial paper with the doctrine of remote and proximate cause. They say in effect: If a county officer forges negotiable bonds and sells them the purchaser who sustains loss may recover from a surety which has contracted to protect everyone against official misconduct; but if he forges nonnegotiable county orders the purchaser who sustains loss may not recover. It cannot be denied that the officer is equally guilty of official misconduct in each case; but it is said that in the latter case the loss is too remote from the original cause, for the reason that it could not reasonably have been foreseen in the light of attending circumstances. This latter proposition is qualified by the observation that a purchase of nonnegotiable orders without inquiry as to their genuineness is out of the ordinary course of business, unnatural, improper, and incapable of anticipation. If this observation is vital to the position taken, it may be said that two answers suggest themselves: (a) The case before us is presented upon bill and demurrer. There is not the remotest suggestion in the bill that the bank purchased the orders without making inquiry as to their genuineness. (b) Nor is it averred that the purchase of such orders was not pursuant to a well-known business custom. I take it that every banker acquainted with the conduct of the fiscal affairs of counties knows that the purchase for investment of county orders which the county issuing them is not ready to pay is a common course of business. So in the last analysis the proposition is reduced to this: A loss sustained by the purchaser of forged nonnegotiable county orders is as a matter of law so remote from the act of forgery that the latter cannot be regarded as an efficient cause of the loss; that the mere fact that the orders were not payable to order or bearer breaks the otherwise obvious causal connection between the official misconduct and the loss. Even if the case before us can properly be reduced to this status, it seems to me to leap to the common understanding that the conclusion is unsound. It was just as likely that the orders would be dealt in by innocent parties as it was that the county treasurer would be finally so deceived as to pay them; and it is admitted that the payment by the treasurer was a proximate result of the forgery.

There is another view of the case: Even conceding that the surety company would not be liable to the bank, it does not necessarily follow that the former is entitled to the subrogation sought and to a recovery from the latter. There remain to be considered the equities of the parties as between themselves, in view of their relations to the entire transaction. The final question in a case of this character is: Who in good conscience ought to stand the loss? In answering it, I am unwilling to say that the surety for a forger should

156 F.—3

be allowed to indemnify himself at the expense of an innocent victim. The surety company says to the bank:

"The indorsement and sale of the orders by the deputy were his personal acts. I am not responsible for them. Therefore, because you bought the orders, you should stand the loss."

But the bank may reply:

"You are responsible for his forgery, which was the first act and the dominant one in his scheme to defraud. Without it no one would have suffered loss. For a paid consideration you guaranteed the county and the public, including myself, against his official misconduct; and as between us you should not visit the loss upon one who acted innocently, and so wholly escape every consequence of a conceded breach of your bond."

The bank, which is a defendant here, is in possession of and holds the legal title to the money it got from the county. At law the surety company has no right against the bank, but must make a case that challenges the conscience of a court of equity—not one that merely follows the devious technicalities of the law. When equities are equally balanced, the position of the defendant or the possessor of the thing in controversy is the better. The legal title added to an equity prevails over an equal equity that is not so supported. In Insurance Co. v. Clark, 203 U. S. 64, 27 Sup. Ct. 19, 51 L. Ed. 91, a man and his sister conspired to defraud an insurance company. The former, having insured his life, disappeared. The latter, as beneficiary, sued and obtained judgment, which was paid. Interests in the policies had been assigned to attorneys under contingent fee contracts, and they got their portions of the judgment. It was afterwards discovered that the insured was living and that a gross fraud had been perpetrated. The company brought suit in equity against the beneficiary and the attorneys to recover the money paid. In fact, the attorneys acted innocently and had paid for their shares by their services. Recovery from the beneficiary was allowed, but denied as to the attorneys, who held under the assignments from the guilty beneficiary. The company sought to charge the attorneys with notice because of the non-negotiable character of the policies. The Supreme Court said:

"But notice cannot be established by the mere fact that, while the appellees (the attorneys) held an interest in the policies, they were assignees of choses in action, and took them subject to the equities. This is due to a chose in action not being negotiable. It does not stand on notice."

In a consideration of the equities of the parties, an important feature of the position of the bank is its innocence and good faith. Reference is made in the foregoing opinion to supposed negligence of the bank in buying the orders. The case comes here on bill and demurrer, and if the bank is to be charged with negligence the foundation for it must be found in the bill. I can find no averment in the bill directly or indirectly charging the bank with any negligent conduct whatever. It is not even said that in purchasing the orders it acted irregularly or out of the usual well-known course of business. On the contrary, there is an affirmative admission that it knew nothing of the fraudulent character of the orders. Moreover, the absence of any charge of negligence against the bank is given emphasis by the fact that there are affirmative charges of negligence against

the county treasurer, the chairman of the board of county commissioners, and the depositary of the county funds. It is true that it appears from the bill that the bank purchased nonnegotiable orders and obtained payment of them by the county treasurer; but the status of the parties in such a case results from a fixed rule in the law of choses in action, and not from any supposed negligence of the purchaser in failing to make inquiries. Insurance Co. v. Clark, supra. As bearing upon the assumption of negligence, it is said that an inquiry at the auditor's or treasurer's office would have quickly disclosed the fraud; but the bill fails to charge either that such inquiry was not made or that, if it had been made, it would have resulted in the information. So how can we assume this fact prejudicial to the bank? On the contrary, we know from the averments of the bill and the statutes of Minnesota (Gen. St. Minn. 1878, c. 8, § 169) that about the time of the purchase of the orders they were taken to the treasurer, who indorsed on them a recital of lack of funds for their payment. We also know that about a year later these very orders were paid by the treasurer without question of their validity. The orders were fair on their face, every written evidence of their validity being genuine. When the bank secured them they bore the genuine signature of the deputy auditor, who had authority to execute valid orders; also an impression of the official seal of the auditor's office; also the genuine signature of the chairman of the board of county commissioners to a recital that they were issued by the authority of the board. Under these circumstances, would it not have been an unusual exhibition of diligence had the bank ignored these evidences of regularity and instituted an independent investigation of its own? Are we to say, in the absence of information from the pleader, that the bank omitted to do what ordinarily prudent men engaged in that business would have done under the same circumstances? It is a matter of common knowledge that such orders are widely dealt in by investors, much the same as special tax warrants are in the larger cities. If, when they are presented to the county treasurer, there is no money in the fund upon which they are drawn, the treasurer indorses that fact upon them, and thenceforth they draw interest until funds are available for their redemption. The interest is the inducement to the investors. State v. Bourne, 86 Minn. 432, 90 N. W. 1108.

It is suggested that, if the bank did not have actual knowledge of the fraud (and the bill admits it did not) it had constructive knowledge of all the facts which reasonable inquiry would have disclosed, and therefore of the fraud itself. As to this I need only refer to the rule applied by Mr. Justice Brewer in United States v. Detroit Lumber Co., 200 U. S. 321, 333, 26 Sup. Ct. 282, 285, 50 L. Ed. 499, a case in which conflicting equities were weighed:

"When a person has not actual notice, he ought not to be treated as if he had notice, unless the circumstances are such as enable the court to say, not only that he might have acquired, but also that he ought to have acquired, it but for his gross negligence in the conduct of the business in question. The question, then, when it is sought to affect a purchaser with constructive notice, is not whether he had the means of obtaining and might by prudent

caution have obtained the knowledge in question, but whether not obtaining was an act of gross or culpable negligence."

So when it is said that the orders, being nonnegotiable, were taken subject to the defenses of the county, all is said that is relevant. Negligence, ordinary or gross, and notice, whether actual or constructive, have nothing to do with the case made by the bill in this cause. They are not for our consideration in weighing the equities of the bank, and were not considered by the trial court.

In my opinion the decree should be affirmed.