## WAGER *v.* PROVIDENCE INSURANCE COMPANY.

## PROVIDENCE INSURANCE COMPANY *v.* MORSE.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF NEW YORK.

Nos. 41, 49.  Argued October 18, 1893.—Decided November 6, 1893.

Where a bill of lading provides that in case of loss the carrier, if liable for the loss, shall have the benefit of any insurance that may have been effected on the goods, this provision limits the right of subrogation of the insurer to recover over against the carrier, upon paying to the shipper the loss.

Where the carrier is actually and in terms the party assured, the under-

writer can have no right to recover over against the carrier, even if the amount of the policy has been paid by the insurance company to the owner, on the order of the carrier.

The claim of the master of the vessel, through whose loss the loss of the goods insured took place, to exemption from liability to the insurance companies having been adjudicated against him, and the appeal to this court on that judgment having been dismissed for want of jurisdiction, he is estopped from again setting up that claim in this case.

IN ADMIRALTY. The case is stated in the opinion.

*Mr. J. A. Hyland* for Wager.

*Mr. Edward D. McCarthy*, for the Providence Insurance Company and another.

*Mr. Spencer Clinton*, (with whom was *Mr. George Clinton* on the brief,) for Morse.

MR. JUSTICE SHIRAS delivered the opinion of the court.

In May, 1883, Armour, Plankinton & Co., grain merchants, having their place of business at New York city, were the owners of a cargo of wheat, which they desired to have brought from Buffalo to New York. Henry Morse and Alanson Morse, composing the firm of H. Morse & Co., were doing business as intermediaries or middlemen between boatmen and shippers in procuring cargoes to be shipped. Charles E. Wager was the master and owner of the canal boat William Worden, and also of the steam canal boat Sydney.

Through one Meadows, as their agent, Armour, Plankinton & Co. made a contract with H. Morse & Co., whereby the latter employed Charles E. Wager to take the cargo of wheat, amounting to 7900 bushels, on the boat William Worden, for transportation from Buffalo to New York.

In the spring of 1883, before this cargo was shipped on the canal boat William Worden, the said insurance companies delivered to H. Morse & Co. an open or running cargo policy, which contained the following terms and covenants:

"*Uniform Canal Cargo Policy.*

"The New England Underwriters.

"The Security Insurance Co., of New Haven, Conn.

"The Providence Washington Insurance Co., of Providence, R. I.

"Each acting and contracting for itself, and not one for the other, for the true performance of the premises; each company for its own part only, which is one-half of all liability accruing under this policy, by this policy of insurance, on account of H. Morse & Co., for whom it may concern, do insure the several persons whose names are hereafter endorsed hereon as owner, advancer, or common carrier, on goods, wares, merchandise, or country produce, on his own boat, or boats belonging to others, loaded on commission or chartered, from place to place, as endorsed hereon, or in a book kept for that purpose, for the several amounts, at the rate, and on the goods, wares, merchandise, or country produce, as specified in the said endorsement.

"No risk considered as insured under this policy until said endorsement is approved and signed by these companies, or their duly authorized agents at ———, unless with special agreement with the companies and endorsed hereon."

Before the cargo in question was put on board the William Worden, H. Morse & Co. applied to Worthington & Sill, the general agents at Buffalo of these insurance companies, to insure the cargo of wheat while *in transitu* on board the William Worden.

That application was in writing, as follows:

"Worthington & Sill, General Agents.
"New England Underwriters' Canal Insurance.
"Office, No. 48 Main Street, Buffalo, N. Y.

"Insurance is wanted by H. Morse & Co. Loss, if any, is payable to do. or order, on wheat inboard cargo of boat 'William Worden.' $9875, from Buffalo to New York.

"Rate —— cts. is..................$———
"Total premium...................$———
"Buffalo, May 17, 1883. H. MORSE & Co., *Applicant.*"

On receipt of this application, Worthington & Sill delivered to H. Morse & Co. a certificate of insurance in the following words:

"Providence Washington Insurance Co., Providence,
    R. I.
"Security Insurance Co., New Haven, Conn:
"New England Underwriters.
"Inland Marine Department.
"Worthington & Sill, Gen'l Agents, Buffalo, N. Y.

*"Canal Cargo Certificate.*

"No. 668.                                        $9875.

"This certifies that H. Morse & Co. insured under and subject to the conditions of policy, No. 772, issued by the New England Underwriters, in the sum of ninety-eight hundred seventy-five dollars, inboard cargo of boat 'William Worden.' On wheat $9875, at and from Buffalo to New York.

"Loss (if any) payable to assured or order and return of this certificate. This certificate of insurance is not valid until countersigned by the authorized agents for this company at Buffalo, N. Y.

"Buffalo, N. Y., May 17, 1883.

                              "WORTHINGTON & SILL,
                                     *"General Agents."*

Upon the delivery of said certificate of insurance, Worthington & Sill entered in the book kept for that purpose, "H. Morse & Co., boat 'William Worden,' from Buffalo to New York, $9875, rate 15 cts., premium $14.82, wheat." This certificate of insurance was endorsed in blank by H. Morse & Co., and delivered to Meadows, the agent of Armour, Plankinton & Co.

Thereupon Wager and H. Morse & Co. signed and delivered to Meadows an affreightment contract or bill of lading as follows:

" [Vignette.]

"BUFFALO, *May* 17, 1883.

" Shipped by W. Meadows, in apparent good order, on board the canal boat 'Wm. Worden,' of Morse, whereof ——— ——— is master, the following-described property, to be transported to place of destination without unnecessary delay, and to be delivered as addressed on the margin in like good order, in the customary manner, free of lighterage, upon payment of freight and charges as prescribed in this bill. Consignees to pay all harbor towing from and to the usual place of landing. Three week days, regardless of weather, (including day of arrival, providing notice of arrival shall be given before four o'clock P.M.,) after arrival and notice of same, to be allowed consignees to discharge this cargo, after which time the cargo or consignees are to pay demurrage at the rate of two and one-half per cent per day upon the freight, including tolls, for each and every day of such demurrage over the three days as above specified, until the cargo is fully discharged. And it is agreed between the carriers and shippers and assigns that in consideration, especially of the rate of freight hereon named, the said carriers having supervised the weighing of said cargo inboard, hereby agree that this bill of lading shall be conclusive as between shippers and assigns and carriers as to quantity of cargo received inboard and to be delivered at port of destination, and that they will deliver the full quantity hereon named. All damage caused by the boat or carrier, or deficiency in the cargo from quantity as hereon specified, to be paid for by the carrier and deducted from the freight, and any excess in the cargo to be paid for to the carrier by the consignee. In case grain becomes heated while in transit, the carrier shall deliver his entire cargo and pay only for any deficiency caused by heating exceeding five bushels for each one thousand bushels.

" The freight charges and demurrage payable to as directed below or order, at place of destination, who is the only party authorized to collect the same, and whose receipt shall be in full for all demands on this cargo or bill of lading.

"In witness whereof the said master of said boat hath affirmed to two bills of lading, one marked 'Original' and one marked 'Duplicate,' of this tenor and date, one of which being accomplished, the other to stand void.

"7900 bu. No. 2 red wheat, ex cargo schr. 'R. Hallaran.'

"Freight to New York, five (5) cents per bu.

"Advanced charges, $200.

"H. Morse & Co.,

"Per C. E. Wolfe.

"(Seventy-nine hundred bushel.)

"C. E. Wager.

"(In margin:) Armour, Plankinton & Co., New York.

"The freight charges and demurrage, to the amount of $516.94, are payable by check to the order of the National Bank of the Republic, in New York, such check to be delivered to E. B. Brooke & Co., for such bank; the balance is payable to said E. B. Brooke & Co., who is the only party authorized to collect the same, whose receipts shall be in full for all demands therefor."

Meadows, before the William Worden started from Buffalo, forwarded this bill of lading, with the said certificate of insurance attached thereto, to Armour, Plankinton & Co., at New York.

Wager signed and delivered to H. Morse & Co. a collateral or sub-affreightment contract or bill of lading, in the following words and figures:

"Buffalo, *May* 18, 1883.

"Shipped by H. Morse & Co., in apparent good order, on board the canal boat 'William Worden,' of Syracuse, whereof Charles E. Wager is master, the following-described property to be transported to place of destination, without unnecessary delay, and to be delivered as addressed on the margin, in like good order, in the customary manner, free of lighterage,

upon payment of freight and charges, as prescribed in this bill.

" Consignees to pay all harbor towing from and to the usual place of landing.   Three week days, regardless of weather, (including day of arrival, providing notice of arrival shall be given before four o'clock P.M.,) after arrival and notice of same, to be allowed consignees to discharge this cargo, after which time the cargo or consignees are to pay demurrage at the rate of two and one-half per cent per day upon the freight, including tolls, for each and every day of such demurrage over the three days as above specified, until the cargo is fully discharged.   And it is agreed between the carriers and shippers and assigns that in consideration especially of the rate of freight hereon named, the said carriers having supervised the weighing of said cargo inboard, hereby agree that this bill of lading shall be conclusive as between shippers and assigns and carriers as to quantity of cargo received inboard and to be delivered at port of destination, and that they will deliver the full quantity hereon named.   All damage caused by the boat or carrier or deficiency in the cargo from quantity as hereon specified to be paid for by the carrier, and deducted from the freight, and any excess in the cargo to be paid for to the carrier by the consignee.   In case grain becomes heated while in transit, the carrier shall deliver his entire cargo and pay only for any deficiency caused by heating, exceeding five bushels for each one thousand bushels.

" The freight charges and demurrage to the amount of $—— are payable by check to the order of —— ——, New York, such check to be delivered to —— —— for such bank, the balance payable to said —— ——, who is the only party authorized to collect the same, whose receipt shall be in full for all demands therefor.

" Tolls on this cargo having been advanced by H. Morse & Co., if refunded, must be to them or to their order.

" In witness whereof the said master of said boat hath affirmed to two bills of lading, one marked 'Original' and one marked 'Duplicate' of this tenor and date, one of which being accomplished, the other to stand void.

" 7900 bushels of wheat.

" Freight to New York, per bushel, 5.............. $395 00

  Captain's advance ............................. 319 44

On safe delivery, E. B. Brooke & Co. collect as

    above and pay captain...................... $75 56

  " Hold, subject to our draft, $319.44.        H. MORSE & Co.,

  " Care E. B. Brooke & Co., New York.          *Fero.*

  " J. W. Schlehr, Dept. Clerk."

Morse & Co. advanced to Meadows, the agent of Armour, Plankinton & Co., $200 for prior advances made by said agent upon the wheat, being charges for carriage from Chicago to Buffalo, and by the bills of lading the cargo was to be delivered upon payment of this advance and the freight. Pursuant to the contract between Meadows, agent, and Morse & Co., the latter agreed and undertook, for and in consideration of the payment of $395, the payment of which was made a lien on the cargo, to transport the same to New York, and to insure the cargo. Morse & Co. paid the premium to the insurance companies.

Upon the voyage the William Worden was wholly under the control of the steamboat Sidney, and both boats were navigated practically as one vessel. On May 28, 1883, while proceeding on the voyage down the Hudson River, the William Worden struck the rocks on Esopus Island and sunk; and her cargo was damaged to the amount of $6175.89.

On June 26, 1883, the insurance companies paid to Armour, Plankinton & Co. the sum of $9211.75 on account of the loss of the cargo insured and upon an abandonment by the owners to the insurance companies, and about the same time they paid Morse & Co. the sum of $520 in full for their interest in the cargo, in which sum was included $14.82, the premium theretofore paid by them on the policy.

Subsequently the insurance companies brought an action *in rem* against the boats William Worden and Sidney in the Circuit Court for the Southern District of New York, and in that action Wager intervened as owner of the vessels, and

Morse & Co. became sureties for the Worden and for claimant's costs.

In this suit it was found that the carriers had been guilty of negligence in their management of the said vessels in the voyage, which had resulted in the loss, and the Circuit Court decreed that the two vessels be condemned in favor of the insurance companies.

In May, 1887, the insurance companies filed in the District Court of the United States for the Northern District of New York a libel and complaint against Henry Morse & Co. and Charles E. Wager, whereby the libellants sought to be subrogated to the claims of the owners against the respondents as carriers. This cause was so proceeded in that a decree in favor of the libellants was rendered by the District Court against the respondents for $6292.16, whereof $4617.16 was payable by all the respondents, jointly and severally, and $1675 was payable by Wager severally.

From this decree separate appeals were taken, one by H. Morse & Co. and one by Charles E. Wager, to the Circuit Court of the United States for the Northern District of New York. The Circuit Court reversed the decree of the District Court against H. Morse & Co., and dismissed the libel as to them, and affirmed the decree against Wager, and gave judgment against him, including interest and costs in both courts, for $8446.37. From this decree of the Circuit Court separate appeals have been taken to this court, one by the insurance companies, complaining of the dismissal of the libel against H. Morse & Co., and the other by Charles E. Wager, complaining of the decree against him.

We shall first consider the questions arising under the appeal of the insurance companies.

It is contended that the insurance companies, having paid the loss to the owners of the cargo, are entitled to be subrogated to the rights of the assured against the carriers.

It is too well settled by the authorities to admit of question that, as between a common carrier of goods and an underwriter upon them, the liabilty to the owner for their loss in destruction is primarily upon the carrier, while the liability of

the insurer is only secondary.   The contract of the carrier may not be first in order of time, but it is first and principal in ultimate liability.   In respect to the ownership of the goods, and the will incident thereto, the owner and the insurer are considered but one person, having together the beneficial right to the indemnity due from the carrier for a breach of his contract or for non-performance of his legal duty.   Standing thus, as the insurer does, practically, in the position of a surety, stipulating that the goods shall not be lost or injured in consequence of the peril insured against, whenever he has indemnified the owner for the loss he is entitled to all the means of indemnity which the satisfied owner held against the party primarily liable.   His right rests upon familiar principles of equity.   It is the right of subrogation, dependent not at all upon privity of contract, but worked out through the right of the creditor or owner.   Hence it has often been ruled that an insurer, who has paid a loss, may use the name of the assured in an action to obtain redress from the carrier whose failure of duty caused the loss.   *Hall & Long* v. *Railroad Companies*, 13 Wall. 367, 369.

But it is equally well settled that the right, by way of subrogation, of an insurer, upon paying for a total loss of the goods insured, to recover over against the carrier, is only that right which the assured has, and that accordingly when a bill of lading provides that the carrier, when liable for the loss, shall have the full benefit of any insurance that may have been effected upon the goods, this provision is valid, as between the carrier and the shipper; and that, therefore, such provision limits the right of subrogation of the insurer, upon paying the shipper the loss, to recover over against the carrier.   *Phœnix Ins. Co.* v. *Erie & Western Transportation Co.*, 117 U. S. 312; *St. Louis, Iron Mountain &c. Railway* v. *Commercial Union Insurance Co.*, 139 U. S. 223.

If a valid claim by the underwriter to be subrogated to the rights of the owner will not arise where the carrier has contracted with the owner that he, the carrier, shall have the benefit of any insurance, it would seem to be clear that where the carrier is actually and in terms the party insured, the

underwriter can have no right to recover over against the carrier, even if the amount of the policy has been paid by the insurance company to the owner on the order of the carrier.

The facts in the present case were that the open policy declared that it was issued on account of H. Morse & Co. for whom it may concern, and that it insured the several persons, whose names should be thereafter endorsed thereon as owner, advancee, or common carrier on goods, wares, merchandise, or country produce, on his own boat, or boats belonging to others, loaded on commission or chartered.

Under this open policy, Morse & Co. applied to the insurance companies, stating that insurance was wanted by H. Morse & Co., on wheat valued at $9875, from Buffalo to New York. Loss, if any, to be payable to Morse & Co. or order. Upon this application, the insurance companies issued what is termed an insurance certificate to H. Morse & Co., setting forth that, subject to the conditions of policy No. 772, H. Morse & Co. insured, in the sum of $9875, the inboard cargo of boat William Worden ; the loss, if any, to be payable to assured or order, and return of this certificate. The premium was paid by H. Morse & Co.

Clearly, under this state of facts, H. Morse & Co. were, nominally at least, the parties insured, and came within the terms of the policy, and, upon a loss, were entitled to receive the amount of the policy, and, of course in that event, the insurers could not, after having paid H. Morse & Co. the amount of the loss, recover it back from them under the principle of equitable subrogation. The question then arises whether a different conclusion should be reached because of the fact that H. Morse & Co., when they delivered the bill of lading to Meadows as agent for Armour, Plankinton & Co., attached thereto the insurance certificate endorsed by them in blank.

So far as the insurance companies were concerned, H. Morse & Co. were under no obligation to transfer the policy to Armour, Plankinton & Co., nor to make it payable to them in case of loss. That was a matter entirely between H. Morse & Co., as carriers, and Armour, Plankinton & Co., as consignees and owners of the cargo.

When, subsequently, the insurance companies paid to Armour, Plankinton & Co. the amount of the loss, they did so, not by virtue of any contract between themselves and the consignees, but of the contract between themselves and H. Morse & Co., whereby they had agreed to pay the loss to the latter or order.

We think, therefore, that the Circuit Court was right in dismissing the libel against H. Morse & Co., and its decree to that effect should be affirmed.

Coming now to the appeal of Wager, No. 41, October term, 1893, we are met by the contention that Wager, as master of the Sydney and as carrier, was entitled to the benefit of the insurance, and that, hence, it was error on the part of the Circuit Court to allow the insurance companies to recover against him by way of subrogation. It is admitted that Wager was not nominally, and in terms, insured; but the testimony of Morse and of Wager himself is relied on as showing that it was understood and intended that Wager was a beneficiary under the policy.

We are not called upon to consider whether this parol evidence was admissible to affect the meaning and legal effect of the policy and certificate of insurance, nor what the proper conclusion would be, if the evidence were competent, because the question of Wager's liability was determined and adjudicated against him in the case of *The Sydney*, in the Circuit Court for the Southern District of New York, as stated in the findings of facts in this case, and reported in 27 Fed. Rep. 119.

In that case, the libellants, the insurance companies, alleging that they had paid the owners of the cargo the loss occasioned by the negligence of the carrier in charge of the vessel, sought to be subrogated to the owner's cause of action, and Wager, having been permitted to intervene as claimant, by his answer admitted that he was owner of the vessel, denied that the libellants had insured the owners of the cargo; and claimed that he had paid the premium to the insurance companies, upon the agreement that the benefit of the policy, in case of loss, should accrue to his benefit as carrier, and that,

therefore, no right of subrogation in favor of the insurance companies existed.

These issues of fact and law were determined against Wager and in favor of the insurance companies, and a final decree condemning the vessel was rendered. This decree remains unreversed and in full force.

It cannot be questioned that, in the present case, the Circuit Court could, and this court on appeal can, take notice of the former case in the Southern District, because the proceedings and decree therein are set up at length in the answer of Wager in the present case. It is true that Wager alleges, in his answer, that he had prosecuted an appeal to the Supreme Court, which was then pending. But the record of that appeal shows that it was dismissed by this court for want of jurisdiction. *The Sydney,* 139 U. S. 331.

We think, therefore, that the Circuit Court did not err in regarding Wager as having been concluded by the trial and decree in the former case, and in entering a final decree against him.

In both appeals the decree of the Circuit Court is

*Affirmed.*

MR. JUSTICE BROWN, not having heard argument in this case, took no part in its decision.