65 F.2d 570 (1933)
THE J. L. LUCKENBACH.
CALIFORNIA VICTOR DISTRIBUTING CO.
v.
COONAN et al.
No. 418.
Circuit Court of Appeals, Second Circuit.
June 12, 1933.
*571 Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (L. De Grove Potter and Joseph Whelan, both of New York City, of counsel), for appellants.
Single & Hill, of New York City (Robert E. Hill, C. Welmore Robinson, and Loring R. Lecraw, all of New York City, of counsel), for appellee.
Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.
MANTON, Circuit Judge.
The appellee shipped its cargo of radio receiving sets and equipment on the steamship J. L. Luckenbach, which sailed from Boston in September, 1929, for San Francisco, Cal. The cargo in question was loaded at Philadelphia in No. 8 shelter deck, filling it up, and the hatches were battened down on the morning of September 15, and the vessel sailed that day. She called at New York, and, after taking on more cargo, none of which was stowed in No. 8 shelter deck, sailed for the West Coast on September 18th. While the vessel was in Boston, she made repairs and there was some chipping and scraping of the paint work in the cargo compartments preparatory to repainting.
When the ship arrived at San Francisco, it was ascertained that a lead pipe in the aftermost part of No. 8 shelter deck, at the extreme stern of the vessel, had been punctured. This pipe was the discharge conduit from the firemen's toilet and shower room, located on the port side of the weather deck directly above the after part of No. 8 shelter deck. The pipe came down through the weather deck into the No. 8 shelter deck space and then it turned outward under the deck head to the side of the vessel, where it followed the ship's skin downward behind the cargo battens for several feet and then made another turn through the ship's side, discharging through a non-return valve fitted to the hull plating. It was found that the hole had been punched through the lead pipe by a member of the crew in an attempt to clear it from obstructions which had accumulated there in a way to stop the flow of water from the toilets. Nos. 7 and 8 shelter decks were fitted with two scuppers located in the port and starboard corners forward. Investigation made later, while the vessel was making her Puget Sound *572 ports, showed that the scuppers were clogged with paint scrapings and other débris which produced an accumulation of water in the cargo compartments a foot and a half deep.
The after part of No. 8 shelter deck is separated into a special cargo locker by means of a slat bulkhead which consisted of planks about six or seven inches wide with one-inch space between them secured to the beam overhead and at the bottom to an angle bar riveted to the deck. The angle bar was six inches high with a three-inch flange to the deck and tightly fitted between the face angle of the two frames on each side of the vessel and in the wings where it was made watertight by cement. Thus constructed, it formed a dam six inches high and acted as a watertight obstruction preventing any water which accumulated in the after part of the shelter deck from finding its way to the scuppers until it had reached a sufficient depth to overflow the angle bar and then flow to the scuppers in the forward wings. The No. 8 shelter deck is cambered toward the sides which would permit less accumulation of water than if it had been level, but, with its measurements as they were given, the accumulation would extend inboard from the side of the ship a distance of 16 feet and a like distance aft. This accumulation would flow over the angle bar into the cargo forward as the vessel pitched. Such an accumulation of water, occurring in the manner described, would cause damage to the lower tiers of cargo stored in this special cargo locker.
The commissioner found that the absence of limber holes in the angle bar made it possible for water to be dammed up behind the bar; that it was improper to have the angle bar built in as described in the shelter deck unless it was provided with limber holes to secure adequate drainage of the water. There is ample evidence to support this finding and liability therefore follows. The Willdomino, 300 F. 5 (C. C. A. 3); May v. Hamburg, etc., Line, 63 F.(2d) 248 (C. C. A. 2); Hartford & N. Y. Transp. Co. v. Rogers & Hubbard Co., 47 F.(2d) 189 (C. C. A. 2); The Waalhaven, 36 F.(2d) 706 (C. C. A. 2); Secy. of State v. Dreyfus & Co., 8 Lloyd's List Law Reports, 92; Micks Lambert & Co. v. U. S. S. Bd., 16 Lloyd's List Law Reports, 277.
The scuppers were three-inch pipes located in the forward wings of Nos. 7 and 8 shelter decks, and the commissioner found that they were clogged up in such a way as to prevent drainage of the water and cause it to accumulate in both compartments to a depth varying from a foot to a foot and a half. There was contrary testimony to the effect that they were clear and offered free drainage at the commencement of the voyage and it is said that at least due diligence was exercised in testing their drainage prior to loading cargo. The scupper pipes lead downward from the shelter deck following the curvature of the ship's side and then inboard to the shaft tunnel where they were fitted to another long pipe which ran some 90 feet forward to the engine room tank tops. The entire distance was between 110 and 120 feet. The tests claimed to have been made consisted of pouring a bucket of water through the opening in the shelter deck but no one stood at the opening of the line under the engine room floor to see if the water flowed freely. An adequate test would have been the use of a hose in forcing the water through. There was ample evidence to support the findings that the scuppers were clogged before the cargo was loaded in Boston and that due diligence was not exercised. It was found that the workmen, who chipped and scraped the old paint in Boston, failed to remove paint chippings thoroughly, and that this and other débris from the preceding voyage caused the clogging. There was very considerable accumulation of such paint peelings on the deck in the cargo compartments after the surfaces had been cleaned and scraped and this sufficiently explains the cause of the stoppage in the scuppers.
The scuppers were placed in the cargo compartment to care for any accumulation of water for the purpose of draining it off before it reached a depth equal to that of the dunnage in the compartment and before it came in contact with the cargo. They were intended for more than mere drainage of the ship's sweat. Scuppers were intended to take away any water entering the vessel at least up to their capacity whether such water came from leaks, sweat, broken pipes, or whatever source. The findings below that the scuppers were clogged before the ship sailed and that due diligence was not exercised were sufficiently supported by the evidence. It was the duty of the shipowner, in providing a cargo-worthy vessel, to make it fit for the cargo carriage undertaken. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65; The Edw. I. Morrison, 153 U. S. 199, 215, 14 S. Ct. 823, 38 L. Ed. 688; The Thomas P. Beal, 11 F.(2d) 49 (C. C. A. 3).
The commissioner found that the damage to the soil pipe was due to an act of negligence of a seaman occurring after the ship *573 left port  an error of management  and that section 3 of the Harter Act (46 USCA § 192) exempted the vessel from liability for damage resulting from such fault or error. If the hole was there before the voyage, it would be a breach of warranty of seaworthiness. The Newport, 7 F.(2d) 452 (C. C. A. 9); The Manitou, 127 F. 554 (C. C. A. 2). If it occurred after the commencement of the voyage, it is an error of management. Kalbfleisch Corp. v. United States (D. C.) 53 F. (2d) 867; The Touraine, 29 Lloyds List Law Reports, 265. We agree with the finding below that the damage to the soil pipe was caused after the sailing of the vessel and that it constituted an error of management and no liability may be predicated on this act.
The bill of lading contained the following provision:
"22. Shall make all claims for damage to cargo, misdelivery or delay in delivery thereof, or shortage of packages or portions of packages of the herein described cargo, fully disclosing the nature and extent thereof in the presence of the captain and/or agent of this company and/or the delivering carrier at destination before the cargo is removed from the carrier's custody or final receipts signed. Unless written demand for payment of claims for damage, misdelivery or delay in delivery, or shortage of portions of packages of the herein described cargo shall be made upon the carrier liable therefor, or upon the carrier that actually delivered the goods, within ten (10) days after delivery, all claims for damage of whatsoever nature and extent shall be taken to have been waived. * * *"
Upon arrival, appellant's surveyor made an extensive examination of the damaged cargo on the dock at San Francisco and tried to estimate the extent and amount of the damage. Some of the cargo was removed from appellant's custody on October 9, 1929, and the balance on October 10, 1929. A receipt for each was signed on each day  on October 9th at 10:30 a. m. and on October 10th, at 2:30 p. m. Appellee's officer sent a letter dated October 9th stating, "we hereby make formal claim upon you for the damage, amount to be determined later." The letter was mailed at San Francisco that day to the appellant at San Francisco. The officer of the appellee testified that mail which he dictated was always mailed the same day as written, and he remembered this letter because of its importance. Although he did not personally deposit the letter in the mail box, he gave it to the mail clerk. The mail clerk was not called, but the proof sufficiently supports the finding that the letter was mailed October 9th, and received in the regular course of the mails on October 10th, before the last receipt for delivery of the goods was signed. This letter was answered October 12th, and we think it was timely to satisfy the notice clause.
The question is presented whether there was compliance with the requirement of the notice of claim "that all claims for damage * * * fully disclosing the nature and extent thereof in the presence of the captain and/or agent of this company and/or the delivering carrier at destination" should be made before removal of the cargo. The letter of October 9th did not state the damage, but merely said the cargo was more or less damaged and that details would be sent when ascertained. It was found below that, under the circumstances, the appellant knew the nature of the damage because its surveyor attempted to make an estimate of the damage, and, although no agreement was reached as to its extent, appellant approved the return of the goods to the factory for repairs. Since there was sufficient compliance with the requirement of the full disclosure of the nature and extent of the damage, we need not inquire whether or not this provision of the notice clause was unreasonable. Notice clauses containing similar requirements have been before this court, but the reasonableness of the requirements has not been raised. The Lake Gaither (C. C. A.) 26 F.(2d) 198; W. R. Grace & Co. v. Panama R. R. Co. (C. C. A.) 12 F.(2d) 338; The Genl. G. W. Goethals (C. C. A.) 298 F. 935.
The courts have been consistent in holding that notice of claim clauses must be complied with unless unreasonable in the circumstances and that cargo owners bear the burden of proving compliance. Queen of the Pacific, 180 U. S. 49, 21 S. Ct. 278, 45 L. Ed. 419; Bank of California, N. A., v. I. M. M. Co., 64 F.(2d) 97 (C. C. A. 2). When the time in which the notice must be given is the question, the test of reasonableness is applied. U. S. Industrial Alcohol Co. v. Calmar S. S. Corp., 57 F.(2d) 182 (C. C. A. 2); E. Gerli & Co. v. Cunard S. S. Co., 48 F.(2d) 115 (C. C. A. 2); The President Polk, 43 F.(2d) 695 (C. C. A. 2). And, where the time stated is unreasonable, notice is not excused entirely, but it must be given within a reasonable time. Bank of California, N. A., v. I. M. M. Co., supra; Cudahy Packing Co. v. Munson S. S. Line, 22 F.(2d) 898 (C. C. A. 2); The Texas Maru, 13 F.(2d) 538 (C. C. A. 2). Where the sufficiency of notice rather *574 than the time of notice has been brought into question, compliance with a reasonable notice clause has been required. Anchor Line v. Jackson, 9 F.(2d) 543 (C. C. A. 2). Notice of damage is not notice of claim for damage, and the shipowner's knowledge that damage has occurred does not remove the necessity of giving notice of claim. The San Guglielmo, 249 F. 588 (C. C. A. 2); The Persiana, 185 F. 396 (C. C. A. 2); The St. Hubert, 107 F. 727 (C. C. A. 3). Where notice is required before the removal of the goods, it has been said that it is not enforceable with respect to damages not discernible before the removal. The Turrett Crown, 284 F. 439, 442 (C. C. A. 4); The Westminster, 127 F. 680, 682 (C. C. A. 3). Contra, Moore v. Harris, 1 App. Cases, 318, where it was said that, when the notice clause requires claim before removal, claim must be made not only for apparent damage, but also for damage which could be discovered by a careful examination before removal.
In the instant case the radio receiving sets were damaged by water. Full disclosure of the nature and extent of the damage which was apparent before removal of the goods could be required reasonably. The shipowner's knowledge that damage had occurred would not excuse failure to disclose (The San Guglielmo, supra; The Persiana, supra), but here there was sufficient disclosure. The appellant's surveyor testified that he and its freight claim agent went over the damaged cargo with the consignees. It was not essential that notice of claim be in writing. The Vallescura (D. C.) 43 F.(2d) 247; Fiorita & Amoroso v. Cunard S. S. Co. (D. C.) 10 F.(2d) 244. Disclosure of the nature and extent of the damage as far as it was known on the dock was made to the appellant's agent and this provision, of the notice clause was complied with.
The second part of the notice clause required written demand for payment of claims for damage within 10 days after delivery. The commissioner found, and the court approved, that this requirement was (a) unreasonable, (b) had been complied with, and (c) had been waived. However burdensome the clause may have been, it was agreed upon by the parties and we may not say that it was entirely useless. From the carrier's view-point, it may have seemed necessary. In addition to a claim for damages, written demand for payment was made. In the absence of legislative regulation, it is not for the courts to question the utility and burdensome character of such a clause. A test of reasonableness of such clauses considers, not the utility of the provision, but the cargo owner's ability to comply with it in the circumstances. The meaningless character of the clause was stressed below, and it was said to be practically impossible of fulfillment in the present case. If the provision means that the exact sum must be ascertained and stated within ten days after delivery, it is clear that in many cases such a claim would be unreasonable because of the impossibility of determining damages within such time. It is disclosed here that the damages were not ascertained in ten days. Although demand for payment usually does imply a statement of the sum demanded, this clause of the bill of lading does not refer to the amount, and where the circumstances, as here, render the appellee unable to make known the amount of his damage, the clause may be interpreted as reasonably requiring the demand but not necessarily stating the exact sum. This practice of interpreting a notice clause as making a reasonable demand we have accepted. The Lake Gaither, 26 F.(2d) 198 (C. C. A. 2). And here a demand might be made within the ten days without stating the exact sum claimed. The claim for damages referred to in the first part of clause 22 is not a demand for payment. The underwriter's letter sent within the ten-day period would not comply with this clause, and that letter did not comply with the demand here referred to. But the letter of October 9, 1920, to which we have referred, written by the secretary of the appellee, was a sufficient compliance with the requirement of this clause.
We do not think, as found below, that the appellant's letter of October 12th, or any conduct of the appellant, constituted a waiver of the notice clause. Cudahy v. Munson Line, supra; Grace v. Panama R. R. Co., supra. The letter denied responsibility for the damage and concluded by stating that all defenses under the bill of lading were reserved. To succeed, compliance with the notice clause was essential.
The bill of lading provided that the carrier would have the benefit of any insurance or any payments repayable only out of the recovery against the carrier "notwithstanding the underwriters are not obligated to make such payment." The insurance policy provided, "and it is also understood and agreed, that in case any agreement be made or accepted by the assured with any carrier or bailee by which it is stipulated that such or any carrier or bailee shall have, in case of any loss for which he may be liable, the benefit *575 of this insurance, or exemption in any manner from responsibility grounded on the fact of this insurance, then and in that event the insurer shall be discharged of any liability for such loss hereunder." This case is controlled by The Turret Crown, 297 F. 766 (C. C. A. 2), which was followed in Philippine Refining Corp. v. United States, 41 F. (2d) 1010 (C. C. A. 2). While the carrier may contract for the benefit of the insurance (Phnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 312, 6 S. Ct. 750, 29 L. Ed. 873; Wager v. Providence Ins. Co., 150 U. S. 99, 14 S. Ct. 55, 37 L. Ed. 1013), unless forbidden by statute [China Fire Ins. Co. v. Davis, 50 F.(2d) 389, 76 A. L. R. 1259 (C. C. A. 2)], still the carrier obtains only the benefits of such contract. If it contracts for the benefit of insurance paid to the shipper, it does not obtain the benefit of loans to the shipper repayable out of recovery from the carrier. Luckenbach v. W. J. McCahan Sugar Co., 248 U. S. 139, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522. In the instant case, the carrier contracted for the benefit of any payments repayable out of recovery from the carrier. The shipper did not obligate itself to take out such insurance and saw fit to obtain insurance worthless to the carrier. Bradley v. Lehigh Valley R. R., 153 F. 350 (C. C. A. 2). The shipper obtained insurance void in the event of an agreement to give the carrier its benefits and the insurance company made the loan repayable only out of recovery from the carrier. It would have been a breach of the condition of the policy, which would render it void, for the carrier to have obtained the benefit of this insurance by an agreement with the appellee. The parties must therefore be regarded as intending the payment by the insurance company to be a loan only and payable under the term of the loan receipt. If we construe the provision of the bill of lading as the appellee's promise to carry insurance for the benefit of the carrier, the policy was void. Such construction should be avoided. Luckenbach v. W. J. McCahan Sugar Co., supra.
Decree affirmed.
SWAN, Circuit Judge (concurring).
I do not agree with all that is said concerning the notice clause. The first sentence of clause 22 does not expressly provide that the claiming of damages before removal of the cargo shall be a condition precedent to recovery. We should not import that condition; such clauses are to be strictly construed against the carrier. See Dunn v. Hannibal & St. J. R. R. Co., 68 Mo. 268. Furthermore, I think it unreasonable to require a full disclosure of "the nature and extent" of damage before the goods are removed. The second sentence of clause 22, requiring a "written demand for payment of claims * * * within ten (10) days after delivery," is also invalid because unreasonable, if it requires the amount of the claim to be stated under circumstances where, as here, the monetary extent of the damage cannot be so promptly ascertained.
In the decision of affirmance I concur.