Vincent NARDELLI, Robert G. Nardelli and William Nardelli, as Claimants-Owners of THE NARCO, Appellants,

v.

STUYVESANT INSURANCE COMPANY OF NEW YORK, Appellee.

No. 16763.

United States Court of Appeals Fifth Circuit.

Sept. 5, 1958.

of the M/V Lolita to recover from those responsible for her sinking. It was filed against Robert A. Wilson, Nardelli, and the M/V Narco.[1] At the time of the collision on July 24, 1953, the Narco was being operated by Nardelli under a lease-purchase agreement from Wilson. Nardelli impleaded Stuyvesant under Admiralty Rule 56, 28 U.S.C.A.

The district court found the Narco solely at fault in causing the collision and entered judgment against her in rem and against Nardelli in personam for $29,075.00, but dismissed the in personam claim against Wilson on the ground that Nardelli was operating the Narco under a bareboat charter at the time of the collision. The court further dismissed as to Stuyvesant on the ground that the coverage of Stuyvesant's policy did not extend to Nardelli as bareboat charterer. La Interamericana, S. A. v. The Narco (The Narco-The Lolita), D.C.S.D.Fla.1956, 146 F.Supp. 270. This appeal is taken from that part of the decree holding Stuyvesant not liable.

The lease-purchase agreement from Wilson to Nardelli was executed on July 15, 1952,

> "for the term of thirty-six (36) months, from the 15 day of July, A.D., 1952, expiring on the 15 day of July, A.D., 1955, now next ensuing, for the sum of Seven Hundred, Sixty-two Dollars and thirty-three ($762.33) cents per month, payable in advance each and every month, except that the amount for the first month shall be Ten Thousand ($10,-000.00) Dollars, payable on the signing of this Agreement, plus insurance prorated on a monthly basis which is now Eighty-three Dollars and thirty-four ($83.34) cents per month."

John Germany, Tampa, Fla., for appellant.

John P. Corcoran, Jr., Tampa, Fla., Douglas D. Batchelor, Miami, Fla., William E. Henson, Jr., Tampa, Fla., Brown, Brown & Corcoran, Tampa, Fla., for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from that portion of a decree in admiralty dismissing the third-party petition filed by the appellants, hereinafter called Nardelli, against the appellee, hereinafter called Stuyvesant. The libel was filed by another maritime insurance company which had become subrogated to the rights of the owner

Nardelli was granted the option, on or before the expiration of the lease, to buy the vessel for $37,440.00, the approximate sum of the cash payment and the installments, and when Nardelli should

1. Her former name, M/V Thelma, appears in the insurance certificate, but we refer to her as the M/V Narco.

pay for the vessel, "then this instrument shall ipso facto operate as a conveyance and transfer of said property, and the title thereto to said lessee's (sic)." [2] The agreement obligated Nardelli to "in no wise suffer any liens or encumbrances to be against the said trawler during the life of this instrument."

The insuring agreement, a copy of which was attached to the petition of Nardelli, was entitled "Special Marine Certificate," bore "No. PB 31," and was dated August 14, 1952, one month after the date of the lease. Its opening provisions were:

> "*This Certifies that* Gibbs Corporation and C.I.T. Corporation has effected insurance under and subject to the conditions of Open Policy No. OHL 1050 of The Stuyvesant Insurance Company of New York issued in the name of the Gibbs Corporation. Covering the respective interests of the said (Named Assured and/or Purchaser, hereinafter called 'Assured') Robert A. Wilson, Gibbs Corporation and C.I.T. Corporation in the sum of $25,000.00—Dollars upon the (description of property to be insured) oil screw, Miss Thelma. Valued at $25,000.00—Dollars at and from (12:01 A.M., Standard Time at place of issuance) August 14, 1952 and ending August 14, 1953 unless sooner terminated as hereinafter provided. The Company to be paid in consideration of this insurance One Thousand and No/100—Dollars being at the rate of four per cent. Loss, if any, to be adjusted in accordance with the terms of the policy and payable to Assured—or order, in funds current in the United States of America."

Attached to the certificate were the "Insuring Agreements," which include the collision or full running-down clause quoted in the margin.[3] The certificate

---

**2.** At the time of the collision on July 24, 1953, it would appear that Nardelli had paid a total of $19,147.96; by the time of final decree on December 17, 1956, Nardelli had paid the full purchase price. Hence, Wilson suffered no loss from the the in rem judgment against the vessel.

**3.** "And it is further agreed that if the vessel and/or property insured shall come into collision with any other Ship or Vessel and the Assured or the Charterers or the Surety in consequence of the insured vessel being at fault shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, we, the Underwriters, will pay the Assured or Charterers or the Surety, whichever shall have paid, such proportion of such sum or sums so paid as our respective subscriptions hereto bear to the value of the Vessel and/or property insured, provided always that our liability in respect of any one such collision shall not exceed our proportionate part of the value of the Vessel and/or property insured. And, in cases where the liability of the Vessel has been contested, or proceedings have been taken to limit liability, with the consent in writing of a majority (in amount) of Hull Underwriters, we will also pay a like proportion of the costs which the Assured or Charterers shall thereby incur, or be compelled to pay; but when both Vessels are to blame, then, unless the liability of the Owners or Charterers of one or both of such Vessels becomes limited by law, claims under the Collision Clause shall be settled on the principle of Cross-Liabilities as if the Owners or Charterers of each Vessel had been compelled to pay to the Owners or Charterers of the other of such Vessels such one-half or other proportion of the latter's damages as may have been properly allowed in ascertaining the balance or sum payable by or to the Assured or Charterers in consequence of such collision; and it is further agreed that the principles involved in this clause shall apply to the case where both Vessels are the property, in part or in whole, of the same Owners or Charterers, all questions of responsibility and amount of liability as between the two Vessels being left to the decision of a single Arbitrator, if the parties can agree upon a single Arbitrator, or failing such agreement, to the decision of Arbitrators, one to be appointed by the Managing Owners or Charterers of both Vessels, and one to be appointed by the majority (in amount) of Hull Underwriters interested; the two Arbitrators chosen to choose a third Arbitrator before entering upon the reference, and the decision of such single, or of any two of such three Arbitrators, appointed as above, to be final and binding. Provided always that this clause

bore an endorsement dated January 2, 1953, also set forth in the margin.[4] The identical collision clause was, of course, contained in the Open Policy No. OHL 1050. The open policy was effective from May 3, 1952, about two and one half months before the lease-purchase agreement. Other provisions of the open policy which might possibly be pertinent are quoted in the margin.[5]

shall in no case extend to any sum which the Assured or Charterers or the Surety may become liable to pay or shall pay for removal of obstructions under statutory powers, for injury to harbors, wharves, piers, stages, structures or any other objects (excepting other Vessels and property thereon), consequence on such collision, or in respect of the cargo, baggage or engagements of the Vessel and/or property insured, or for loss of life, or personal injury. And provided also that in the event of any claim being made by anyone other than the owners of the Vessel and/or property hereby insured under this clause he shall not be entitled to recover in respect of any liability to which the Owners of the Vessel and/or property insured, as such would not be subject, nor to a greater extent than the Owners of the Vessel and/or property insured would be entitled in such event to recover."

4.   "Endorsement

"Attached to and forming part of Policy No. PB 31 of the Stuyvesant Insurance Company of New York Insurance Company Name of Assured Robert A. Wilson, Gibbs Corporation and C.I.T. Corporation. It is hereby understood and agreed the policy insuring agreements as written are amended to include:

"Protection and Indemnity Clauses which was excluded in the original certificate issued on August 14, 1952.

"All other terms and conditions of the policy remain unchanged.

"Date January 2, 1953   Harry R. James
Agent."

"I.

5.   "Assured.

"This Policy of Insurance witnesseth, that the Stuyvesant Insurance Company of New York by these presents, does make insurance and cause to be insured, lost or not lost:   Gibbs Corporation as hereinafter provided or for account of whom it may concern.

"II.

"Loss Payable.

"Assured or order.

"III.

"Interests Insured.

"(A) Double Interest. The interest of Gibbs Corporation or any assignee thereof, herein called the 'Named Assured', and of any retail purchasers financing or refinancing the purchase of property insured, herein called 'Purchasers' and

"(B) Single Interest. The interest of the Named Assured in property insured, financed or refinanced by the Assured for retail purchasers as described in individual policies or certificates issued in connection with this Open Policy is insured hereunder as provided in this Open Policy and in such individual policies or certificates, as their respective interests may appear.

"(C) For Account of Others. It is further agreed that this policy is extended to cover property insured as hereinafter provided for the account of others and not provided for in paragraphs III (A) and (B) but only at the request of the Gibbs Corporation and upon acceptance by this Company or its Agent.

"IV.

"Property Insured.

"This policy covers Hulls and/or Marine Engines, Machinery, Electric Light Apparatus and similar equipment, Appurtenances, Parts and Supplies for same which the Named Assured has sold for installation in vessels under partial payment contracts as hereinafter provided.

"V.

"Territorial Limits.

"This policy covers property insured hereunder while located or operated within the Continental United States, Canada, Mexico, Central America, Puerto Rico or the Inland or Coastal Waters of the aforementioned countries.

"VI.

"Attachment and Evidence of Insurance.

"Open Policy. At and from 12:01 A.M. (Eastern Standard Time), the Third day of May, 1952, until cancelled. The insurance hereunder upon each property insured attaches as of the time of execution of the bailment lease, conditional sale, mortgage or other encumbrance, but only if reported to the Company or its authorized Agent within thirty (30) days thereafter. The insurance hereunder upon property insured under Paragraph III (C) shall attach as of the date and time of such request. The acceptance of each risk and the particulars of insurance thereon shall be evidenced by an individual policy or certificate of insurance issued hereunder.

*     *     *     *     *

Various grounds, some of them overlapping, have been, or might be, urged for the extension of the coverage of Stuyvesant's policy to Nardelli: 1. Does Nardelli have standing as an assured because he provided the monies for the payment of the premium? 2. Is Nardelli an assured encompassed by the category "for the account of whom it may concern"? 3. Does Nardelli have status as an assured because he was an installment sales purchaser covered by the policy? 4. Is Nardelli covered as a "charterer" under the collision or running-down clause quoted in footnote 3, supra? Is he excluded by the concluding provision of that clause? We shall undertake to consider and decide each of those possible grounds of Stuyvesant's liability.

1. *Does Nardelli have standing as an assured because he provided the monies for the payment of the premium?*

The payment of premiums on a policy of insurance is persuasive that the party paying them intended himself to be covered.[6] The lease-purchase agreement between Nardelli and Wilson went no further to carry out that intent than to provide that Nardelli agreed to pay "insurance prorated on a monthly basis, which is now Eighty-three Dollars and thirty-four ($83.34) cents per month." The words "is now" obviously referred to the Stuyvesant policy, and that is confirmed by the fact that the $83.34 monthly payments exactly totalled the $1000.00 annual premium called for in the "Special Marine Certificate." Something more was required than Nardelli's agreement to pay to Wilson the amount of the premium which Wilson in turn either would pay or had paid to Stuyvesant. If Stuyvesant had not held out an offer to Nardelli to become an assured, or otherwise parted with its right to select its own assureds-questions to be hereinafter considered—it was not bound by the dealings between Wilson and Nardelli to which it was not a party and of which it is not shown to have had any knowledge or notice. Nardelli's agreement to pay the amount of the premium is no more than persuasive of *his* intent. Stuyvesant's intent also is essential to the contract.

Further, even as between Wilson and Nardelli, Nardelli's simple agreement to pay the amount of the premium did not shift the responsibility for the loss. The Barnstable, 1901, 181 U.S. 464, 468, 470, 473, 21 S.Ct. 684, 45 L.Ed. 954. A fortiori is that true where, as in this case, the policy covered many risks.

2. *Is Nardelli an assured encompassed by the category "for the account of whom it may concern"?*

Unless that category is limited by other terms of the policy, it covers all parties having an insurable interest at

"XIII.
"Protection and Indemnity Clauses.
    *      *      *      *      *
"This Company shall be subrogated to all the rights which the Assured may have against any other person or entity, in respect of any claim or payment made under this policy, to the extent of such payment and the Assured shall, upon the request of this Company, execute all documents necessary to secure to this Company such rights.
"This Company shall be entitled to take credit for any profit accruing to the Assured by reason of any negligence or wrongful act of the Assured's servants or agents, up to the measure of their loss, or to recover for their own account from third parties any damage that may be provable by reason of such negligence or wrongful act.

"Special Conditions.
"XIX.
"Conditions Precedent to Liability to the Named Assured.
"The Named Assured agrees, and it is a condition precedent to the Company's liability to the Named Assured for loss or damage hereinafter called 'Loss':
"1.  Double Interest.
    *      *      *      *      *
"(h) That the Named Assured shall notify the Company promptly of any change in ownership or increase in hazard in respect of any property insured hereunder which shall come to its knowledge and shall account to the Company for the premium for such increased hazard."

6. The John Russell, 2 Cir., 1934, 68 F.2d 901, 902.

the time of the happening of the loss.[7] At the time of the sinking, Nardelli had paid more than half of the total purchase price for the Narco (see footnote 2, supra). For that reason, among others, he had an insurable interest in the vessel.[8]

The policy does, however, in several of its terms, definitely limit Stuyvesant's liability for the account of others than Gibbs Corporation, and specifically retain Stuyvesant's right to select its own assureds.[9]

In accordance with such limiting terms of the policy, the "Special Marine Certificate" was issued "covering the respective interests of Robert A. Wilson, Gibbs Corporation and C.I.T. Corporation." As to Nardelli, however, Gibbs Corporation never requested coverage; Nardelli's lease-purchase agreement was never reported to Stuyvesant, nor did Stuyvesant ever issue any individual policy or certificate naming Nardelli as an assured. In the absence of other provisions of the policy, therefore, Nardelli was not included in the category "for the account of whom it may concern."

3. *Does Nardelli have status as an assured because he was an installment sales purchaser covered by the policy?*

We think that paragraph III of the policy, quoted in footnote 5, supra, has reference only to purchasers financed or refinanced by the Named Assured Gibbs Corporation. In any event, under paragraph VI, quoted in the same footnote, no liability attached when Nardelli's lease-purchase was not reported to Stuyvesant or its authorized agent within thirty days after its execution. Further, the acceptance of that risk was not evidenced by any individual policy or certificate. It follows that Nardelli was not a "purchaser" within the coverage of the policy.

4. *Is Nardelli covered as a "charterer" under the collision or running-down clause quoted in footnote 3, supra? Is he excluded by the concluding provision of that clause?*

The collision or running-down clause, quoted in footnote 3, supra, is identical with the standard clause adopted by the American Institute of Marine Underwriters, except for the insertion of the words "and/or property" throughout that clause. An earlier edition of that clause is set forth in footnote 1 in Harbor Towing Corp. v. Atlantic Mutual Insurance Co., 4 Cir., 1951, 189 F.2d 409, 410, 411; see also 4 Richards on Law of Insurance, 5th ed., pages 2057, 2064. One of the purposes of the revision was to provide expressly that the collision must be "in consequence of the insured vessel being at fault," so as to meet the holding of this Court in The Fanny D, 5 Cir., 1940, 112 F.2d 347, 350, with which the Fourth Circuit differed in Harbor Towing Corp. v. Atlantic Mutual Insurance Co., supra.

A comparison of the collision or running-down clause in footnote 3, supra, with both the standard clause and its earlier edition shows that in the present policy the words "and/or property" have been inserted in several places. The obvious reason for that insertion was that the property insured included more than the vessel itself.[10] The insertion does not attach the insurance to the property insured contrary to the traditional concept of insurance as a contract binding and benefiting particular persons.[11] Grammatically, the words are

7. Hagan v. Scottish Union & National Ins. Co., 1902, 186 U.S. 423, 427, 22 S. Ct. 862, 46 L.Ed. 1229; The John Russell, 2 Cir., 1934, 68 F.2d 901, 902; Miami Jockey Club v. Union Assurance Society, 5 Cir., 1936, 82 F.2d 588, 589.

8. Phoenix Insurance Co. v. Erie & Western Transportation Co., 1886, 117 U.S. 312, 323, 6 S.Ct. 750, 29 L.Ed. 873; Munich Assur. Co. v. Dodwell & Co., 9 Cir., 1904, 128 F. 410, 413; The John Russell, 2 Cir., 1934, 68 F.2d 901, 902.

9. See for example, paragraphs III (B) and (C) and VI quoted in footnote 5, supra.

10. See footnote 5, supra, under "IV Property Insured."

11. The City of Norwich, 1886, 118 U.S. 468, 494, 6 S.Ct. 1150, 30 L.Ed. 134; Carpenter v. Providence Washington Ins. Co., 1842, 16 Pet. 495, 41 U.S. 495, 10 L.Ed. 1044.

annexed to "the owners of the," so as to mean "the owners of the property" in the conjunctive and alternative with "the owners of the vessel." The insertion of the phrase "and/or property" does not, then, change the meaning of the standard clause in any respect here important.

Without that phrase, the concluding provision reads:

"And provided also that in the event of any claim being made by anyone other than the owners of the Vessel hereby insured under this clause he shall not be entitled to recover in respect of any liability to which the Owners of the Vessel insured as such would not be subject, nor to a greater extent than the Owners of the Vessel insured would be entitled in such event to recover."

The expression "anyone other than the owners of the Vessel hereby insured" admittedly would include a mere bareboat charterer, which the district court held that Nardelli was at the time of the collision.

The first sentence of the collision clause, however, makes plain that the underwriter will pay for a liability of the charterer and will even pay the charterer directly. That sentence, eliminating the added phrase "and/or property" for the sake of clarity, reads:

"And it is further agreed that if the Vessel insured shall come into collision with any other Ship or Vessel and the Assured or the Charterers or the Surety in consequence of the insured vessel being at fault shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, we, the Underwriters, will pay the Assured or Charterers or the Surety, whichever shall have paid, such proportion of such sum or sums so paid as our respective subscriptions hereto bear to the value of the Vessel insured, provided always that our liability in respect of any one such collision shall not exceed our propor-

tionate part of the value of the Vessel insured."

The two sentences, and indeed the entire policy, must, of course, be construed together as one harmonious whole. In its inception the policy was meant to cover Gibbs Corporation, the shipbuilder and seller of the vessel under the lease-purchaser agreement, and C.I.T. Corporation, the finance company which purchased the installment notes. The endorsement (footnote 4, supra) added Wilson, the lease-purchaser of the vessel, as one of the assureds. The contention of the underwriter, successfully pressed below, assumed that Wilson was the sole owner, and argued that, since Wilson was exonerated from in personam liability, the collision came within the last sentence, the exclusion clause.

We disagree with that contention on several grounds. First, we do not think that Wilson was the sole owner within the meaning of the phrase "the owners of the Vessel hereby insured." That phrase, we think, includes all of the persons having any interest in the vessel and who were insured by name under the policy, that is, Wilson, Gibbs Corporation and C.I.T. Corporation, according to their respective interests. That construction seems to us necessary in order that the collision clause may fulfill its general purpose, which, since its revision, must be conceded to be in accordance with the Fourth Circuit's view of the earlier edition: "And it becomes clear, when all the terms of the collision clause are borne in mind, that the parties intended to safeguard the owner against the consequences of a collision in which his vessel was at fault." Harbor Towing Corp. v. Atlantic Mutual Insurance Co. supra, at 189 F.2d 411, 412. See also, Peters v. Warren Insurance Co., 1840, 14 Pet. 98, 10 L.Ed. 371; General Mutual Ins. Co. v. Sherwood, 1852, 14 How. 351, 14 L.Ed. 452; Western Transit Co. v. Brown, 2 Cir., 1908, 161 F. 869.

Further, even though Wilson was expressly exonerated from in personam liability, and Gibbs Corporation, and C.I.T. Corporation were also not personally

liable, it does not follow that the collision came within the last sentence, the exclusion clause. The vessel itself was responsible for the sinking on an in rem libel. The underwriter was obligated to protect Wilson, Gibbs Corporation, and C.I.T. Corporation against loss of their respective interests in the vessel. If the Narco had been condemned in toto for the payment of the loss, at the time of the collision, the total loss which Wilson might have suffered was the balance of the purchase price then remaining unpaid and that of Gibbs or C.I.T. Corporation was the amount of the indebtedness for which either held a lien upon the vessel.

Charterers were covered in the first sentence of the collision clause not from any desire to protect them as such, but in order adequately to safeguard the owners of the vessel against the application of the fiction that the vessel may be a wrongdoer, though the owners are not personally responsible.[12] Accordingly, to the extent of the largest sum which would have been necessary to indemnify either Wilson, Gibbs Corporation, or C.I.T. Corporation against loss of their respective interests in the vessel at the time of the collision, we think that the concluding sentence does not exclude coverage of Nardelli.

Stuyvesant argues, however that such a construction of the collision clause deprives it of its subrogation rights as against Nardelli.[13] Subrogation rights against charterers could, of course, have been retained consistently with the broad purpose of the collision clause to protect the owners of the vessel. When, however, charterers were included among those insured, subrogation rights could be retained against them only by a provision clearly counteracting the effect of such inclusion. The general language appearing in provisions (see footnote 11, supra) contained in an entirely different and far removed part of a lengthy policy would not suffice. It is most unusual for an insurer to have subrogation rights against a party and for a risk which it seeks to insure.[14] Any reasonable doubt must be resolved against an interpretation that would result in absolving an insurer from liability because of subrogation.[15]

We hold, therefore, that Nardelli can recover from Stuyvesant to the extent of the interest in the vessel which, at the time of the collision, the named assureds could have lost on an in rem libel. The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

CAMERON, Circuit Judge.

I concur in the result.

TUTTLE, Circuit Judge (dissenting).

With deference to the views of my colleagues I respectfully dissent. I think the holding of the majority opinion does violence to the provision appearing as the last sentence in footnote 3:

"And provided also that in the event of any claim being made by anyone other than the owners of The Vessel [and/or property] hereby insured under this clause he shall not be entitled to recover in respect of any liability to which the Owners of the Vessel [and/or property] insured as such would not be subject * * *."

All agree that Nardelli is not an owner of this vessel; all agree that the owners are not personally liable for the dam-

12. The Eugene F. Moran, 1909, 212 U.S. 466, 474, 29 S.Ct. 339, 53 L.Ed. 600; The Barnstable, 1901, 181 U.S. 464, 467, 21 S.Ct. 684, 45 L.Ed. 954.

13. The provisions of the policy for Stuyvesant's subrogation are quoted in footnote 5, supra, under "XIII Protection and Indemnity Clauses."

14. Wager v. Providence Insurance Co., 1893, 150 U.S. 99, 108, 109, 14 S.Ct. 55, 37 L.Ed. 1013; The John Russell, 2 Cir., 1934, 68 F.2d 901, 902.

15. Nicholson Transit Co. v. Nicholson Universal S.S. Co., 6 Cir., 1932, 60 F.2d 90, 92.

age to the libellant. In such circumstances the policy says there can be no recovery on the policy in favor of Nardelli. The conclusion of the court that this limiting provision means only part of what it clearly says seems to me to be an unwarranted rewriting of the policy in favor of Nardelli who, while enjoying its protection under certain circumstances, was not even a party to it.

I think the judgment of the trial court was correct and that it should be affirmed.