**Walter KESSLER and Carrie Kessler, Plaintiffs,**

**and**

**Joseph G. Kennelly, Jr., d/b/a Joseph G. Kennelly Moving & Storage Company and Reliance Insurance Company, a Foreign Corporation, Intervenors-Plaintiffs-Appellants,**

**v.**

**PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, a Foreign Corporation, Defendant/Counter-Plaintiff-Appellee.**

No. 74–2021.

United States Court of Appeals, Fifth Circuit.

May 5, 1976.

Rehearing Denied June 17, 1976.

Daniel J. Sullivan, Coral Gables, Fla., for intervenors-plaintiffs-appellants.

Robert H. Crary, Jeanne Heyward, Miami, Fla., for Penn. Nat.

Michael P. McGuire, Coral Gables, Fla., for Kessler.

Before BROWN, Chief Judge, WISDOM and INGRAHAM,* Circuit Judges.

JOHN R. BROWN, Chief Judge:

A multi-party, multi-claim, multi-court Donnybrook[1] in which all have at one time or another lashed out against each for all or any part they could get, this Tinker-to-Evers-to-Chance[2] ended when our suitors were put out by an infield fly.[3] In more traditional terms, the victims of a Florida indefensible criminally negligent vehicle collision sued in the state courts of Florida all of those within reach of any potential liability which soon triggered the inevitable claims, cross-claims, indemnifications and counter-suits among the supposed insurers of the Florida certificated carriers and the owners or operators of the rig at fault. As they hopefully tag end in this Kilkenney

---

* Replacing Judge Murrah, who died October 30, 1975, after having the full benefit of the taped arguments and briefs.

1. See, e. g., *Grigsby v. Coastal Marine Service of Texas, Inc.,* 5 Cir., 1969, 412 F.2d 1011, 1969 AMC 1513; *Simmons v. King,* 5 Cir., 1973, 478 F.2d 857.

2. See, e. g., *Nations v. Morris,* 5 Cir., 1973, 483 F.2d 577, 1973 AMC 1413; *Abramson v. Boedeker,* 5 Cir., 1967, 379 F.2d 741; *United States Lines Co. v. Williams,* 5 Cir., 1966, 365 F.2d 332, 1966 AMC 2418.

3. William S. Stevens, The Common Law Origins of The Infield Fly Rule, 123 U.Pa.L.Rev. 1474 (1975).

fair[4] the District Judge held against one of the insurers and its assured—who must have been joined to give the insurer a more attractive cloak—and in favor of the victorious other insurer for what, at most, was attorney fees in its successfully maintaining the defense that its policy did not cover the occurrence.

Finding that the Judge's hunch, *see* Hutcheson, J., The Function of The "Hunch" In Judicial Decision, 25 Ga.B.J. 127 (Nov.1962), on Florida law became an *Erie*-fact about the time he ruled on his own, we affirm on the basic claim but reverse as to the counter-claim of its not-so-friendly rival insurer for attorneys fees.[5]

## In The Beginning

The genesis of our problem starts, of course, with the collision of February 18, 1971 between a tractor rig owned by Fargo, driven by one of its employees, but under lease-contract to Kennelly, when it crossed the center line on the highway to Punta Gorda more than 50 miles from Miami and crashed into the Kessler-Vollmer car. Nothing would have engaged the eight Judges,[6] state and federal, without this event. But the complications which beset us occurred much earlier.

Fargo, a household carrier certificated by the Florida Public Utility Commission (PUC) with geographical authority limited to specified Miami area of Dade County, entered into a contract with Kennelly which had wider PUC operating authority by which Fargo's equipment would in effect be leased to Kennelly with Fargo supplying the driver. As to be expected among knowledgeable businessmen, this relationship and the contract posed legitimate insurance problems complicated, as also to be expected, by the overriding demands of Florida law and PUC regulations to assure protection to the public and property owners.

For the movement occasioning this accident Fargo could not haul the shipment under its own certificate so it used Kennelly's operating authority, relying on the interrelation agreement[7] with Fargo's equip-

---

4. See note 1, *supra*.

5. This is the cast of characters:

   Fargo: Fargo-Anchor Moving and Storage, Inc., a Florida certificated household goods carrier with geographical authority limited to the Miami area in Dade County.

   Penn: Pennsylvania National Mutual Casualty Insurance Company, the liability insurer for Fargo with a 50-mile radius limitation.

   National: National Indemnity Insurance Company, a simultaneous liability insurer of Fargo with a like 50-mile radius limitation.

   Kennelly: Kennelly Moving and Storage Company, a Florida certificated carrier whose authority included the site of the accident.

   Reliance: Reliance Insurance Company, the liability insurer of Kennelly with Fargo as an additional assured.

   Kesslers: Mr. and Mrs. Walter Kessler were passengers in the automobile that was struck by the leased truck on Feb. 18, 1971 incurring severe personal injuries.

   Vollmer: Vollmer, the Executrix for Mr. and Mrs. Redmon who were passengers in the Kesslers' car. Vollmer represented the deceased in an earlier state court case resulting from these injuries. See *Vollmer v. Fargo-Anchor Moving and Storage, Inc.* (Fla.App.1974), 288 So.2d 523.

6. In Florida courts, one circuit trial judge, three of the District Court of Appeals, one Federal District Judge and three judges of the Court of Appeals not including, of course, a petition for rehearing en banc involving another 12, plus the prospect of petition for certiorari to the Supreme Court.

7. There was much hue and cry vis-a-vis the insurer's, damage claimants and others on whether this was authorized by Kennelly under the agreement. But this cut no figure below nor do the parties urge it here.

ment being driven by its since convicted employee.

### Fargo's Lay-Off On Underwriters

Fargo had earlier obtained a liability policy from Penn with Penn filing the required certificate of insurance with PUC.[8] But the policy contained a 50-mile radius endorsement.[9] National, which is now a much relieved and innocent bystander, subsequently issued [10] a liability policy to Fargo

---

8. It stated in part:

FILED WITH
"THE FLORIDA RAILROAD AND PUB
UTILITIES COMMISSION
*(To be executed in triplicate)*

This is to certify that all of the motor vehicle equipment operated by the undersigned Auto Transporta tion Company in the State of Florida is insured with the **Pennsylvania National Mutual Insuranc** (Name of Insurance Company) in full compliance with Rule 310-5.30 of the Rules and Regulations of the Florida Railroad and Public Utilities Commission, governing auto transportation of passengers and/or property, and Chapter 323, Florida Statutes, under the following policy:

KIND OF POLICY ·                                          NUMBER

Public Liability and Property Damage 100/300 B.I. 10,000 P.D. GA 307 11 65 86
Cargo

DESCRIPTIVE SCHEDULE

Auto Transportation Company **Fargo-Anchor Moving & Storage, Inc.**
Address of Auto Transportation Company **301-345 N.E. 59th Street, Miami, Florida**
 Such insurance shall not expire nor shall cancellation take effect until after thirty (30) days written notice has been given by the undersigned to the Florida Railroad and Public Utilities Commission at its office in Tallahassee, Florida.
 Whenever requested by the Commission, the undersigned agrees to furnish to the Commission a dupli cate original of such insurance policy and all endorsements thereon.
 Dated this **21st** day of **July** , 19 **70** .

**Pennsylvania National Mutual Insurance Co.**
(Name of Insurance Company)

By ........................................................................

*(Signature of Authorized Agent)*

---

9. The policy in issue contained a valid endorsement, approved by the Florida Public Utilities Commission, excluding coverage for accidents occurring outside a radius of fifty miles from the insured's (Fargo's) base at 301–345 N.E. 59th Street, Miami, Florida:

> "It is agreed that the insurance with respect to the automobile described above or designated in the policy as subject to this endorsement applies only if such automobile is used exclusively within a fifty mile radius of the limits of the city or town where such automobile is principally garaged as stated in the policy, except for the occasional use of such automobile for personal, pleasure or family purposes beyond such radius."

Penn's attempt in cancellation for nonpayment of premiums aborted for the simple failure, as required by PUC regulations of Penn, to give simultaneous notice to PUC.

10.

\*      \*      \*      \*      \*      \*

The policy issued by National Indemnity in conformity with § 323.06, Fla.Stat., F.S.A., contained a limitation as to its terms:

> "NATIONAL INDEMNITY CO. of Omaha, Nebraska
> "In consideration of the reduced premium at which this policy is written, it is hereby understood and agreed that no coverage shall be in effect under this policy at any time during which the insured property is more than Fifty (50) miles from the assured's address shown on this policy.
> "All other terms and conditions of such Policy remain unchanged."

\*      \*      \*      \*      \*      \*

with substantially similar 50-mile radius limitation.

The result was that Fargo was in that unusual, and enviable, position of having two insurers for the same liability. This may account for the fact that Fargo is presumably happy with all that has occurred and is neither a party or a supplicant to this appeal.

### The Fargo-Kennelly Agreement

The "Independent Contractors Agreement" between Kennelly and Fargo, after reciting that Kennelly was a certificated intrastate household carrier in Florida and that Fargo is engaged in the business in connection with which it owns or has at its disposal motor vehicle equipment and employees competent and qualified drivers, set forth a number of obligations. Although it described the relationship as "independent contractor"[11] with the drivers to be supplied and all expenses paid by Fargo[12] the contract recognized that operations under it were for Kennelly as the certificated carrier.[13] Presumably this was a Florida adaptation to the similar lease of vehicles owner driven or otherwise, in the interstate system.[14]

■ The contract did have an indemnity agreement running from Fargo to Kennelly but it was limited[15] and was geared into

---

11. "Independent Contractor's Agreement," para. 5:

> It is expressly understood and agreed by and it is the intention of the parties hereto that [Fargo] is an independent contractor only and neither it nor its employees are employees of [Kennelly].

12. Para. 4, [Fargo] agrees:
>   *   *   *   *   *   *
>
> (c) To maintain, without expense to [Kennelly], each and all of the vehicles and equipment furnished by [Fargo] and to keep all such vehicles and equipment clean and in good repair and appearance in accordance with the standards of [Kennelly] and the requirements of the Fla.R.R. & P.U. Commission and other appropriate public authority.
>
>   *   *   *   *   *   *
>
> (f) To pay or cause to be paid the cost of operation of said vehicles including, without limitation, cost of oil, fuel, tires; repairs, all tolls of whatsoever nature incident to ownership and operation of such vehicles, including taxes on any or all of such items.

13. Para. 6, [Kennelly] agrees:
> (a) To accept responsibility as a common carrier under the Florida Railroad and Public Utilities Commission Rules and Regulations, for all activities by [Fargo] in [Ken-

nelly's] service pursuant to this agreement and, *in connection therewith, to be responsible* (1) to [Kennelly's] shippers and consignees for the safe transportation of their shipments as provided in [Kennelly's] tariffs, (2) to the Fla.R.R. & P.U. Commission and other governmental authority having jurisdiction over [Kennelly's] service, and (3) to the public generally (excluding [Fargo], its agents, employees, and representatives, and their representatives) for personal injury or loss of life or damage to destruction of property occasioned by or resulting from the operation of vehicles in the service of [Kennelly] pursuant to this agreement.

14. *Agricultural Transportation Association of Texas v. King*, 5 Cir., 1965, 349 F.2d 873; *United States v. Stephen Brothers Line*, 5 Cir., 1967, 384 F.2d 118; see also the recent opinion, *Transamerican Freight v. Brada Miller*, 1975, 420 U.S. 971, 96 S.Ct. 229, 46 L.Ed.2d 169; *American Trucking Assns. v. U. S.*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337.

15. Para. 4, [Fargo] agrees:
> (i) To comply with all Federal, State, and Municipal laws, ordinances, rules, and regulations relating to performance under this agreement and particularly to the operation of motor vehicles and the provision and use of safety equipment thereon; and to indemnify [Kennelly] against all liability,

the correlative insurance provisions by which Fargo agreed to supply "Bob Tail" liability insurance,[16] and a certificate of insurance [17] but the principal insurance was to be supplied by Kennelly for the benefit of Fargo as well, the only limitation being that it would be "excess" over "over and above any valid and collectible insurance carried by "Fargo." [18] Notable was the absence in Fargo's insurance obligation to provide contractual indemnity insurance to underwrite Fargo's indemnity commitment in para. 4–(i) (see note 15, *supra* ).

### Litigation Sets In

With all of these potential defendants it was not surprising that litigation broke out on all fronts.

### The Kessler-Vollmer State Court Suit

On August 13, 1971 the Kessler-Vollmers filed a damage suit for the accident in the Florida state court against, Fargo, National, its insurer, Kennelly and Reliance, its insurer,[19] together with some additional defendants.[20] The state trial judge acting with a good deal of administrative wisdom severed out the damage claim. Oddly enough National was joined as a party defendant but Penn was not. As we shall see later in the course of our juridical over-the-road journey, see *United Services Automobile Association v. Russom*, 5 Cir., 1957, 241 F.2d 296 at 298, the absence of Penn led the Federal Judge to reject Penn's plea of stare decisis, res judicata, collateral estoppel or the like.

The state trial judge ruled in favor of National because the accident took place beyond the 50-mile radius limitation (see note 10, *supra* ) and entered a final judgment to that effect on January 18, 1973.[21] The Kesslers on February 8, 1973 [see App. 72–75] by stipulation and release settled their claim against Kennelly and Reliance by a dismissal with prejudice, the stipula-

loss, or expense, including fines and penalties, resulting from unlawful or negligent operation of said vehicles by [Fargo], its agents, employees, or representatives.

16. We discovered this from the very fine print of the contract and it must have been insignificant since no party has stressed it or, for that matter, ever tried to explain what this over-the-road legalese means. Presumably it means the smaller trucks used in pickup and delivery within terminal limits.

17. Para. 4, [Fargo] agrees:
(h–l) To furnish Certificate of Insurance showing minimum coverage as required by law for public liability (bodily injury and property damage), said Certificate to name [Kennelly] as an additional named insured and show equipment covered, and give [Kennelly] ten (10) days notice prior to effecting any change in coverage which would lower or eliminate the required coverage on any vehicles covered or to be covered under the terms of this Contractual Agreement.
Although all of the other provisions we have identified are in the printed form this paragraph appears to have been typed in specially giving it, we can assume, some special significance. Interlineated matter, either typed or written, in an otherwise printed contract generally denotes a matter of particular concern added and specifically negotiated by the parties. When a form contract is altered by interlineation which conflicts with printed portions, in-

terlineation prevails. See *Allegheney Mutual Casualty Co. v. State* (Fla.App.1965), 176 So.2d 362.

18. Para. 3, [Kennelly] will furnish at its expense:
(a) Public liability and property damage insurance upon the equipment covered by this agreement in such amounts as [Kennelly] deems proper, not less, however, than required by governmental authority having jurisdiction. Such insurance shall protect and inure to the benefit of [Fargo] only while said equipment is operated pursuant to specification by [Kennelly] as, provided in Paragraph 1 hereof, and shall be excess insurance only over and above any valid and collectible insurance carried by [Fargo].

19. In 1969 the Florida Supreme Court declared that an injured claimant may directly sue or join the insurer as a codefendant in his action to determine the insurer's liability. *Shingleton v. Bussey*, 223 So.2d 713 (Fla.1969).

20. Additional defendants were: John Wayne Dennis; American Red Ball Moving Service, a foreign corporation; American Red Ball Transit Co., Inc., a foreign corporation, Aetna Casualty & Surety Company. None of these parties cut any figure below or here.

21. See, e. g., *Canal Insurance Company v. Baldree*, 5 Cir., 1974, 489 F.2d 1393.

tion and release expressly providing, however, that the settlement would not "affect the cross-claim presently pending [by them] against National, the rig driver and Fargo.[22] Oddly, there was no express reservation against Penn, presumably because it had not yet entered the litigious scene.[23]

Kesslers-Vollmers being unhappy with the judgment letting National out on the 50-mile radius coverage defense appealed this judgment to the Florida District Court of Appeals.

### Another Day Another Court

On April 9, 1973 Kesslers, but not Vollmers filed in the Federal District Court a declaratory suit against Penn to effectuate payment of the $100,000 settlement between Kesslers and Fargo (see note 23, supra) in the hopes of getting some blood out of the turnip, see U. S. v. Carmichael, 5 Cir., 1974, 497 F.2d 36, 39. True to form this case soon got snarled up by Kennelly and Reliance ranging on the side, of all things, the damage claimant Kesslers.[24] Within a month (August 20, 1973) Penn counterclaimed against Kennelly and Reliance asserting that Kennelly and Reliance had the primary coverage.

The Federal Trial Judge, unimpressed by Penn's plea of stare decisis on a state trial judgment as the Erie-indicator, cf. Ford Motor Company v. Mathis, 5 Cir., 1963, 322 F.2d 267, 269 and unwilling at Penn's urging to postpone consideration of the 50-mile coverage question in the Penn policy (see note 9, supra) pending the soon-to-come authoritative decision of the Florida District Court of Appeals, proceeded on his own to interpret and uphold,[25] the validity of the 50-mile exclusion (see note 9, supra) and in doing so held in favor of Penn and against the Kesslers, but still holding off until another day the struggle which confronts us between Penn and Kennelly-Reliance.

Thus, the Kesslers so far had failed in both forums on substantially the same Florida issue of the 50-mile exclusion. For some reason not yet disclosed no appeal was taken from this October 25 judgment so it became for the parties and for all time the law of the Medes and Persians which altereth not.

As for the intramural contest between Fargo's supposed insurers the battle continued to rage. Penn moved for summary judgment against Kennelly and Reliance and on March 14, 1974 the Federal District Judge granted it[26] in favor of Penn against Kennelly and Reliance and granted Penn's counterclaim against Kennelly and Reliance for all sums, including suit costs, attorney fees and the payment of any judgment that issued from the suit, and held Kennelly and Reliance primarily liable. On March 28, 1974 Kennelly and Reliance filed a motion for relief relying on F.R.Civ.P. 60(b), a move which had built-in obstacles.[27]

22. This stipulation and release had no effect on the cross-claim Kennelly and Reliance had against Fargo and National for indemnification.

23. On February 23, 1973, the Kesslers settled with Fargo, but apparently not either of its supposed insurers, for $100,000 but as reflected by the soon-to-be discussed federal suit that judgment was apparently a "paper recovery" and has never been satisfied.

24. Kennelly and Reliance raised with much hue and cry the theory of active-passive tort-feasors but that cut no figure below nor does it here.

25. By his October 25, 1973 final judgment.

26. Penn's motion for summary judgment filed on Jan. 28, 1974 was based partly on Rule 10(c) of the Court's Local Rules for the Southern District of Florida which provides:

Each party opposing a motion shall serve and file a reply memorandum not later than five (5) days after service of the motion [Rule 10(J)I, gives a party opposing a motion for summary judgment ten (10) days in which to serve opposing papers] . . . failure to do so may be deemed sufficient cause for granting the motion by default.

When this District Court entered summary judgment in favor of Penn on March 14, 1974, Kennelly and Reliance had filed nothing in opposition to the motion for summary judgment, with the Court.

27. Why this more difficult row was pursued is not clear since the 30 days for notice of appeal had not yet expired so that for all practical purposes the case was still in the bosom of the Court for such modifications as it saw fit. We

Thereafter Kennelly-Reliance filed a timely appeal in a case which we might not otherwise have ever had to wrestle with had the District Judge used a little patience while awaiting what had to be a decisive decision on a purely Florida question from the lips of the District Court of Appeals.

### The Fog Lifts
### The Erie Beacon Burns Brightly

Between the October 25, 1973 judgment in favor of Penn and the rulings of March 1974 on counterclaims of Penn-Kennelly-Reliance the word came down from on high—as high as a federal court frequently has to go. For on January 8, 1974 the District Court of Appeals basing its judgment on Rule 25–5.31(5) of P.U.C.,[28] as authorized by § 323.08, Fla.Stat. held that "as between an innocent third party injured by the carrier and the company that issues a policy . . . [the insurer] will not be heard to deny coverage to one injured by the carrier in the pursuit of its business in the State of Florida." *Vollmer v. Fargo-*

*Anchor Moving and Storage, Inc.,* D.Ct. of App., 1974, 288 So.2d 523, at 525.

But the Florida court did not stop there. By language so emphatic that it relieves us even of a momentary temptation to certify this decisive question of Florida law to the Supreme Court of Florida as we often but sparingly do[29] the Court went on to declare:

The rights afforded to the injured third party as a matter of public policy would not, of course, foreclose the individual rights between the carrier and its insured if the insured violated the terms of the contract of insurance. 288 So.2d 523, 525.

### Kennelly-Reliance Lose The Main Appeal

■ Were it not for the tag end attack on the judgment entered by the District Court in favor of Penn on its crossclaim against Kennelly-Reliance for what turns out to be, at most, the prospect of recovering attorneys' fees[30] for its successfully maintaining the validity and decisive effect of the 50-mile exclusion, this declaration by an authoritative voice of the Florida judici-

regard this as irrelevant here because we have not approached this from the formidable burdens of 60(b) and have considered Kennelly-Reliance appeal on the merits.

**28.** 1. Florida Rule 25–5.31(5) of the Public Service Commission:

(5) Except as above set forth, the following form of endorsement must be attached to all insurance policies:

No condition, provision, stipulation or limitation contained in the policy or any other endorsement thereon, nor the violation of any of the same by the insured shall affect any way the right of any persons injured in person or *property* by the negligence of the insured or relieve the company from the liability provided for in this endorsement, or from the payment to such person of any such judgment, within the limits set forth in the schedule shown hereon; but the conditions, provisions, stipulations and limitations contained in the policy, and any other endorsements thereon, shall remain in full force and be binding as between the insured and the company.

**29.** *Coastal Petroleum Company v. Sec. of the Army,* 5 Cir., 1973, 489 F.2d 777, on rehearing, 1974, 491 F.2d 973; *Allen v. Estate of Carman,* 5 Cir., 1971, 446 F.2d 1276, on certification, Fla., 1973, 281 So.2d 317, on receipt of answers

to certification, 5 Cir., 1973, 486 F.2d 490; *National Education Association, Inc. v. Lee County Board of Public Instruction,* 5 Cir., 1971, 448 F.2d 451, on certification, Fla., 1972, 260 So.2d 206, on receipt of answers to certification, 5 Cir., 1972, 467 F.2d 447; *Gordon v. The John Deere Company,* 5 Cir., 1971, 451 F.2d 234, on certification, Fla., 1972, 264 So.2d 419, on receipt of answers to the certification, 5 Cir., 1972, 466 F.2d 1200; *Boyd v. Bowman,* 5 Cir., 1971, 443 F.2d 848, on certification, Fla., 1971, 256 So.2d 1, on receipt of answers to certification, 5 Cir., 1972, 455 F.2d 927; *Barnes v. Atlantic & Pacific Life Insurance Co. of America,* 5 Cir., 1975, 514 F.2d 704, note 1, 705, questions answered in *Barnes v. Atlantic and Pacific Life Insurance Co. of America,* S.Ct. of Ala., Dec. 18, 1975, No. 73–4032, 325 So.2d 143.

**30.** Attorneys fees normally should be pleaded and proved and except where equity may allow attorneys' fees from a fund or estate, they may be recovered only when they are authorized by statute or provided for by agreement. Here there was no such statute or basis for awarding attorneys' fees. *Phoenix Indemnity Company v. Union Finance Company* (1951, Fla.), 54 So.2d 188. See *Bass v. Alderman* (1921), 82 Fla. 490, 90 So. 378.

ary, would have permitted us to dispose of this by a simple affirmance under Rule 21.[31] Now, since the *Erie* winds racing thru our wind sock have indicated the proper course, we have to discuss more fully that feature which has generated so much confusion.[32]

■ We, as did the District Judge in overruling Kennelly-Reliance's motions for reconsideration (see note 27, *supra*), are of the clear opinion that whether as a matter of stare decisis or merely as a positive indicator of Florida law, *Vollmer* was of no help whatsoever in the controversy between Kennelly-Reliance and Penn. The efforts of Reliance to cloak itself in the more appealing garb of Kennelly won't do.

First, on the assumption that Reliance can somehow latch onto subrogation[33] rights under its assured Kennelly has under the indemnity agreement (see note 15, *supra*) fails for a number of reasons. At the outset, the Penn policy (see R. 24 *et seq.*) provides insurance under coverage A and B insurance for bodily injury (death) and property damage claims for which the insured shall become legally obligated to pay. And then the policy goes on to expressly exclude liabilities assumed under contracts.[34]

But more importantly, the only other right on which Kennelly, or for that matter Reliance, can rely is the provision in Kennelly's contractual obligation to provide insurance for the benefit of itself and Fargo (see note 18, *supra*). But the trouble with this is that this limitation applies only to insurance "over and above any valid and collectible insurance carried by Fargo, see *General Insurance Co. of America v. Western Fire and Casualty Co.*, 5 Cir., 1957, 241

F.2d 289. Applying *Vollmer* it is now clear for our *Erie* purposes—until the Supreme Court of Florida rules otherwise—that as between the insured and insurer the 50-mile exclusion radius exclusion is valid.

This means that as between Penn and Reliance, or Reliance in the subrogated garb of Kennelly has no claim against Fargo and without a claim against Fargo there is no claim against Penn since there is no possible legal relationship between these two supposed liability insurers whose insurance contracts were entered into at separate times and with no indication from the policies that this was some sort of dovetailed arrangement by which either of the insurers, apart from subrogation, could obtain the benefit of the others policy.[35]

■ Nor do either Kennelly or Reliance get any mileage of the typed-in undertaking by Fargo para. 4(h–1) (see note 17, *supra*) for, as the District Court held with the imprimatur Florida law soon to come in *Vollmer,* the obligation to procure the insurance to be covered by the certificate of insurance was confined to "minimum coverage as required by law," and this thereby brought into play the very limited geographical scope of Fargo's PUC certificate. Not being authorized to operate beyond the geographical limits of the certificated operating authority there was no obligation imposed by Florida statutes or PUC regulations to procure insurance protecting members of the public and third party property owners for operations for which it was not certificated.

The District Judge was therefore completely right in denying Kennelly-Reliance's counterclaim against Penn.

---

**31.** See *N.L.R.B. v. Amalgamated Clothing Workers of America,* 5 Cir., 1970, 430 F.2d 966.

**32.** *Erie R.R. Co. v. Tompkins.*

**33.** *Cf. Nardelli v. Stuyvesant Insurance Co. of New York,* 5 Cir., 1958, 258 F.2d 718, 1958 AMC 2404; *Societa Anonima Navigazione Alta Italia v. Oil Transport Company,* 5 Cir., 1956, 232 F.2d 422, 1956 AMC 1073.

**34.** The policy provides:
This insurance does not apply:

(a) To liability assumed by the insured under any contract or agreement except an incidental contract; . . .
Of course an express indemnity in the sweeping terms used in the contract (see note 15, *supra*) is not one "incidental" to the relationship. See *Canal Insurance Co. v. Dougherty,* 5 Cir., 1958, 247 F.2d 508.

**35.** See, e. g., *American Fidelity and Casualty Co. v. St. Paul-Mercury Indemnity Co.,* 5 Cir., 1957, 248 F.2d 509.

*Penn Must Lick Own Wounds*

 But for reasons which the Judge never articulated he granted indemnity in favor of Penn against Kennelly-Reliance. The argument revealed that this may be much-a-do-about-nothing since Penn has not been required to pay out a dime to anyone. The only possible factual basis for anything more than a theoretical claim is the hope of recovering attorneys' fees for Penn's successful defense vis-a-vis its own insured, Fargo and the damage claimants. Whether Florida would transport into this land-based relationship, as we have done in WWLP [36] maritime situations for a breach of the WWLP where the shipowner has successfully defeated the third party's claim, see *Strachan Shipping Co. v. Koninklyke Nederlandsche S.M., N.N.,* 5 Cir., 1963, 324 F.2d 746, 1964 AMC 3, is a highly doubtful proposition. But assuming that it would, there is no record basis for this largesse.

In the first place, whatever rights Reliance might have through Kennelly under the contract, has to be against Fargo, not its insurer Penn, with whom, apart from subrogation, there is no relationship, correlative rights or duties. Next, on the record which so far as we have been able to sift it out, is barren of Reliance's policy, for all we know—and there is a pretty good likelihood that our guess is a good one—the policy of Reliance is similarly limited to bodily injury/death and property claims growing out of operations, not contractual agreements.

The District Judge was, therefore, wrong in allowing Penn to recover against Kennelly-Reliance, or either of them.

Penn, therefore, loses this inning, but it comes out quite a winner, first, against the Kesslers,[37] and finally as to Kennelly-Reliance's claim.

We accordingly reverse the March 14, 1974 judgment which declared Kennelly and its insurer, Reliance, primarily liable for indemnification to Penn and we also deny attorneys fees to Penn.

Thus, at the end of a long and sometime rocky journey this case comes to an end.

AFFIRMED IN PART; REVERSED IN PART.

---

36. *LeBlanc v. Two-R-Drilling,* 5 Cir., 1976, 527 F.2d 1316.

37. It should be remembered that the October 25, 1973 final judgment was on the declaratory action between the Kesslers and Penn. It was entered in favor of Penn because of the 50-mile radius limitation in the policy and this judgment was never appealed and is not before us here.